IN THE MATTER OF THE DISPUTE BETWEEN ALFRED RANNIE HENDERSON AND JOSHUA D. TUCKER, COMMISSIONER OF PUBLIC LANDS OF THE TERRITORY OF HAWAII.

APPEAL FROM CIRCUIT JUDGE, FOURTH CIRCUIT.

ARGUED APRIL 17, 18, 1912.                    DECIDED MAY 2, 1912.

ROBERTSON, C. J., PERRY AND DE BOLT, JJ.

PUBLIC LANDS—*freehold agreement—planting and care of trees.*
    Under section 326, R. L., trees growing naturally upon the land

In Re Henderson, 21 Haw. 104.

may be counted as in compliance with the requirement as to "the planting and care of not less than an average of ten timber, shade or fruit trees per acre;" the word "and" in the sentence quoted is to be construed as "or."

SAME—*maintenance of home.*

Under chapter 22, R. L., a distinction exists between "residence" and "home." The occupying of a house on a certain piece of land, for the length of time required to obtain title, without making it a home within the proper meaning of the term, but for the purpose merely of making a showing to obtain a patent to the land, and with the intention of going to live elsewhere immediately upon the expiration of that time, does not constitute a compliance with the requirement of section 326, R. L., to maintain a home on the premises, for the intention and good faith inseparably involved in the idea of the maintenance of a home are not present.

SAME—*assignment of interest under freehold agreement.*

An agreement between a freeholder and another whereby the former, for a valuable consideration, gives to the other the right to enter upon the land held under a freehold agreement and to grow and harvest crops of sugar cane thereon constitutes an assignment of a part of the freeholder's interest under the freehold agreement within the purview of section 326, R. L.

SAME—*cultivation of land.*

The cultivation of premises in compliance with the statute must be done by the freeholder or for him by his servants or agents. The crops grown must be the crops of the freeholder and not those of another.

OPINION OF THE COURT BY ROBERTSON, C. J.

Alfred R. Henderson, the appellee, on the 18th day of July, 1907, took up a parcel of government land situate at Kaiwiki 3, Hilo, Hawaii, under a "cash freehold" agreement, the land being described in the agreement as Lot 33, Map 2382, area 25.95 acres, first class agricultural land. The purchase price was $1610, payment of one-fourth of which was acknowledged. The terms of the agreement, set forth in the words of the statute applicable to such cases (R. L. Sec. 326) so far as they are important to this case, were as follows: (1) Payment of the balance of the purchase price in three equal annual instalments with interest; (2) Cultivation of not less than twenty-

five per centum of the area of the premises and the planting and care of not less than an average of ten timber, shade or fruit trees per acre at any one time before the end of the third year; (3) maintenance by the freeholder of his home on the premises from the end of the first to the end of the third year; (4) He shall not assign or sublet his interest, or any part thereof, without the written consent of the commissioner of public lands. And the agreement contained a clause to the effect that if at the end of three years all the conditions shall have been substantially performed the freeholder would be entitled to a land patent for the premises. The second and third payments on account of the purchase price were duly made and receipted for. The final payment, $402.50, was made on July 18, 1910, for which the land agent gave a special or temporary receipt, and the evidence shows that the amount was not paid into the public treasury but was deposited in a bank in the name of the chief clerk of the land office as a special deposit pending the issuance of the land patent. The evidence shows that the patent was made out and signed by the commissioner of public lands, but it does not appear to have received the signature of the governor, and it has not been issued or delivered to the appellee. In the mean time the matter was referred to the attorney general, and the commissioner of public lands notified the appellee that a patent would not be issued to him unless his right thereto should be established in court.

Pursuant to section 274 of the Revised Laws, the commissioner of public lands, acting through the attorney general, instituted these proceedings before the circuit judge for the purpose of determining whether the appellee had substantially performed the conditions of the agreement so as to entitle him to receive a land patent. Issue was joined on the questions whether the conditions as to cultivation, planting and care of trees, maintenance of home, and against assigning and subletting had been fulfilled. The circuit judge found in favor of

the appellee on all the points and made a decree directing the issuance of a patent for the premises to him. From that decree the commissioner of public lands brings this appeal.

Fraud in the initial application for and taking up of the land was not alleged, and no issue as to that is involved.

We will proceed at once, therefore, with the consideration of the four questions at issue.

1. As to trees. There are two phases of this question, one of law, whether the statute and agreement permit to be counted trees naturally growing on the land at the date of the agreement, and one of fact, whether the required number of trees were growing on the land. The requirement is "the planting and care of not less than an average of ten timber, shade or fruit trees per acre." The appellant contends that this language is clear and that it means that the freeholder shall plant and care for that number of trees on his lot even though trees of the designated kinds have already been provided by nature. Section 326 of the Revised Laws provides, *inter alia,* that "Such freehold agreement shall authorize the freeholder to occupy and use the premises therein described and shall entitle him to a land patent for such premises at the end of three years from the date of the payment of such first instalment which shall be the date of the freehold agreement if the following conditions shall then have been substantially performed;" then follow the conditions hereinabove referred to as terms of the agreement, and also this provision: "Conditions for the prevention of waste, the planting of trees or the protection of trees growing or to be planted on such premises," etc. That is to say, the statute contemplates that freehold agreements should contain such provisions regarding the planting of trees and the protection of trees growing or to be planted on the land as would be desirable and appropriate under the circumstances of each case according to whether or not the land is wooded entirely, partly, or not at all. Although the printed form of

agreement which was used contains several blank lines in the place appropriate for stating conditions regarding the planting or care of trees no such conditions were written in, and the only reference to trees contained in the agreement was that above mentioned as term (2). To construe the clause of the statute from which that term of the agreement was taken as meaning that in every case the freeholder must plant an average of ten trees per acre would be absurd when applied to land already heavily timbered, and entirely unnecessary when applied to land having a natural growth of as many as ten trees to the acre.      In view of the subsequent provision contained in the same section of the statute, above quoted, the word "and" in the clause "the planting and care of not less," etc. must be construed as "or," and the corresponding clause in the agreement (term 2) should be given a like construction.      The result, therefore, is that if there were growing naturally on the appellee's lot the necessary number (260) of timber, shade or fruit trees they should be counted, and if, as appears to be the fact, the appellee gave them such care as such trees require, the condition must be held to have been complied with.      On the question of fact whether there were as many as two hundred and sixty trees growing on the appellee's lot there was a conflict of testimony that is difficult to account for.      The appellee admits that he planted no trees because, as he contends, there were more than the required number of kukui, ohia and lauhala trees growing naturally on the land by actual count.      In this he was corroborated by a neighbor who was called as a witness. Two witnesses for the appellant testified that they counted only eighty-three trees and that there were no more than that.      The evidence shows that the trees were growing in two steep gulches where there was a heavy undergrowth and probably it was difficult to make an accurate count.      Under the circumstances we think the finding of the circuit judge, who saw and heard

the witnesses, that the required number and kinds of trees were there, should not be disturbed.

2.   Maintenance of home.   The freeholder is required to maintain his home on the premises from the end of the first to the end of the third year.   The evidence shows that the appellee is an unmarried man, a blacksmith by trade, and employed by the Hakalau Plantation Co. at a salary of one hundred dollars a month.   The premises in question are about two and one-half miles from the plantation.   At the time he took up this land he lived in a house on the plantation, and continued to live there until he moved on to his lot at Kaiwiki.   In the month of June, 1908, he had the plantation company build a house and stable for him on one corner of the lot.   It was a rough board house, of one room, 10 by 12 feet, and the stable was a small one.   The two structures cost about $160 or $170, the appellee being unable to state the exact amount, the expense being, as he supposed, charged to his account, but he had not paid any part of it.   The appellee testified that on July 18, 1908, he began to live in his house to which he had sent a bed and bedding, a chair, table, lamp, oil and some books and writing material; that he made his home there continuously until July 19, 1910, when he moved back to the same house he had previously occupied on the plantation; that during the period of two years he had slept at his house on the homestead lot every night except three or four nights a month when he stayed overnight elsewhere with friends; that he kept at his house at Kaiwiki his working clothes and a change of clothing, but left at the plantation house his trunk and some other clothing, including his Sunday clothes; that a bureau, chairs and a bed, but no bedding, remained in his former quarters, which were unoccupied by others, and he occasionally used them "for convenience;" that he kept shaving utensils at both places; that sometimes he spent Sundays on the Kaiwiki premises; that there was a privy on his lot but no water supply or bathing fa-

cilities; that he took his meals at the plantation boarding house, and had no cooking utensils at his house; that since July 18, 1910, he had been to his place occasionally and still regarded it as his home. He testified also that he intended to live there always "as soon as the place is declared mine and the government builds a road to it." It appears, however, that the government had previously built a road to it. In regard to his sleeping at his house the appellee was corroborated to a certain extent by the testimony of a fellow employe at the plantation who was also engaged in proving up on a piece of land at Kaiwiki. The witness testified that during the two years in question he and the appellee nearly every evening after dinner left plantation headquarters together on horseback to go to their respective places; that generally, after riding about a quarter of a mile, they separated, one going by one road and the other proceeding by another to their lots, though occasionally they went the whole way together. Another witness, also a resident of Kaiwiki, testified to frequently having seen the appellee on the road going up toward or coming down from the direction of his house. On the other hand, four persons who lived in the vicinity of the appellee's lot at Kaiwiki testified to having seen the appellee but seldom at his house. Their testimony was of a negative character and not entitled to much weight. But another witness called by the appellant who spent a portion of his time at Kaiwiki near the appellee's place testified that, desiring to know for his own satisfaction whether the appellee was living in his house, in October, 1908, he put some putty in the key hole of the door of the appellee's house so that the door could not be unlocked without disturbing the putty, and that the putty remained undisturbed until sometime in December when the witness picked it out with a knife. This witness was not impeached nor was his testimony materially shaken. One Swain, a government ranger, testified that he visited the appellee's place once in February, twice in March

and once in July, in the year 1910, and found no signs of recent presence there of a horse. On July 25, 1911, the witness went into the house and found the bedding rolled up, the floor and furniture covered with dust, rat droppings and cobwebs, and many mud-wasp nests on the ceiling and walls. A careful examination of the testimony leads us to believe that the appellee did not spend as many nights at Kaiwiki during the two years in question as his testimony would indicate. It is only fair to say, however, that except for the connection which he maintained with his former quarters at the plantation, as above explained, the appellant failed to show that the appellee lived elsewhere than at Kaiwiki during the period. The evidence shows that since building the house the appellee has done nothing toward improving or beautifying the place, and that he has planted no trees or plants about the house. As having a bearing on this question it may be stated that of the four instalments paid on account of the purchase price of the land, three, amounting to $1206, were advanced by the plantation company at the appellee's request, one instalment and the accrued interest on all having been paid by the appellee, as he put it, "out of my own money."

It is to be noticed at the outset that the legislature has recognized a distinction between a residence and a home. Thus, in section 291 of the Revised Laws, relating to "homestead leases," it is provided that the occupier shall, before the end of two years from the date of the certificate of occupation, build a dwelling house on the premises and begin to *reside* there; and that he shall, from and after the end of two years, continuously *maintain his home* on the premises. And in section 319, enumerating the conditions of "right of purchase leases," it is provided that the lessee shall from the end of the first year to the end of the fifth year continuously *maintain his home* on the premises, while in section 322, relating to the same class of leases, it is provided that the lessee shall be entitled to re-

ceive a patent for the land in fee simple upon his paying the appraised value of the land, if he has performed all the conditions, and has *resided* on the land not less than two years. Referring to these provisions this court in *Hapai* v. *Pratt,* 19 Haw. 1, 3, said, "It will be observed that the condition in the lease cannot be performed to its full extent by a lessee who shortly after the third year of his term applies for a patent, otherwise he could not get a patent until after the fifth year of his term. So that, so far as the right to a patent is concerned, if the lessee has *resided* on the land for not less than two years, it is immaterial to inquire whether the condition as to continuously maintaining *a home* thereon has been carried out. This is also shown by the statute requiring as prerequisites to obtaining a patent a residence on the land of not less than two years and a substantial performance of all 'other' conditions of the lease. To reside on certain premises and to continuously maintain a home thereon do not mean the same thing, as a person may do either one without doing the other."

The lexicographers give the words "home," "residence," "dwelling," "abode," "habitation" and "domicile" as synonyms. At the same time some of them recognize a distinction as to the word "home." In Webster's New International Dictionary, in a note to the word "habitation" it is said, "Home denotes a dwelling place, but connotes especially all the range of sentiment and feeling associated with it. Home is not a mere synonym for house." Fernald, in his Synonyms, Antonyms and Prepositions (p. 201), says, "Home, from the Anglo-Saxon, denoting originally a dwelling, came to mean an endeared dwelling as the scene of domestic love and happy and cherished family life, a sense to which there is an increasing tendency to restrict the word—desirably so, since we have other words to denote the mere dwelling place." The distinction noted by the authorities cited has special application to the case of a man of family. Yet the element of sentiment

In Re Henderson, 21 Haw. 104.

may well enter into the case of an unmarried man, and it may be outwardly manifested by an apparent desire to improve, beautify and make more attractive and interesting his place of abode, though it be a humble one. Particularly would this be practicable, and, indeed, to be expected, where, as in this case, the party is, apparently, financially able to do something along those lines. While the terms of the freehold agreement required the appellee to maintain his home on the land only from the end of the first year to the end of the third year, the fact that the appellee did not begin to live there until the last possible day and ceased to do so on the earliest possible day, taken in connection with what will hereafter appear with reference to the disposition he made of the land lends a color to the character of his residence on the land quite disadvantageous to his claim that he made the place his home. It all tends to show that he took no interest in the place and that it was not regarded by him as a fixed place of abode "with the present intention there to remain." It indicates, on the contrary, an intention to make a technical compliance with what seems to have been a distasteful requirement of his agreement, and shows a kind of residence which, in the last analysis, was merely colorable and entirely lacking in the essential element of good faith. The occupying of a house on a certain piece of land for the length of time required to obtain title, without making it a home within the proper meaning of the term during that period, but for the purpose merely of making a showing to obtain a patent to the land, and with the intention of going to live elsewhere immediately upon the expiration of that time, does not constitute a compliance with a requirement to maintain a home on the premises, for the intention and good faith inseparably involved in the idea of the maintenance of a home are not present. In concluding its opinion in the case of *Hapai* v. *Pratt,* supra, this court said, "We may add that, if it appeared in any way, as it does not in this case, that the compli-

ance with the condition as to residence was not made in good faith, a different conclusion might follow."

We do not say that the fact that the freeholder's place of abode lacked cooking or bathing facilities, or that trees were not planted, or that the place was not improved after it was first occupied, or that the freeholder boarded elsewhere, or kept some of his clothing at another place, or that he did not sleep every night at his abode, but often slept elsewhere, or that he received financial assistance, would show an absence of good faith and an intention to make the place his home. But where, as in the case at bar, all these things concur, and it further appears that the freeholder lived on the lot no longer than he considered absolutely necessary, and then returned to where he had previously lived, and it is also shown that he made no attempt to cultivate the land but immediately upon taking it up turned the possession for the purpose of cultivation over to another, the conclusion is irresistible that the place has not been the occupant's home within the meaning of the law. We hold, therefore, that the condition as to maintaining a home on the premises has not been fulfilled by the appellee.

3. As to assignment. The requirement here is that the freeholder "shall not assign or sublet conditionally, or otherwise, his interest or any part thereof, under the freehold agreement, without the written consent of the commissioner of public lands endorsed on such agreement." The evidence shows that at the time the appellee took up this land sugar cane was growing on that part of it where there were no trees, comprising about twenty-three acres. On July 24, 1907, the appellee made an agreement in writing with the Hakalau Plantation Company, a corporation, hereinafter referred to as "the plantation," which recited that the appellee is engaged in cultivating sugar cane on Lot 33, Kaiwiki 3 Homesteads, and has agreed to deliver to the plantation all of the crops growing upon said land for the term of four years in consideration of the advances,

In Re Henderson, 21 Haw. 104.

promises, covenants and agreements of the plantation therein set forth, therefore, the appellee, in consideration of one dollar and further advances to be made by the plantation to assist him to plant, cultivate and harvest said crops of cane, does sell and convey to the plantation, and its assigns, all the cane growing on said land and all future crops thereafter to be planted during said term. The instrument also provided that if the appellee shall pay to the plantation all sums advanced or to be advanced, upon demand, and shall fulfil the other promises, covenants and agreements by him to be kept and performed, the instrument shall be null and void; but in case of default the plantation is authorized to enter into possession of the land and cultivate and harvest the crops of cane growing thereon, and replant the same, charging reasonable prices for all work that may be done or material that may be furnished, applying same to sales of the crops as if same were cash payments made to the appellee. The appellee covenanted and agreed that in case of default in payment of advances, after demand, "this agreement may be foreclosed by advertisement as provided by statute," or the plantation may, at its election, enter into possession of the land, cultivate, harvest, and remove the crops growing thereon, crediting the appellee with the purchase price thereof. It was mutually covenanted and agreed that the appellee will sell and deliver to the plantation all sugar cane that he shall grow on the lands during said term and that the plantation will pay for same at the rate of four dollars per ton of cane when the price of 96° polarization sugar as received by the plantation in New York is four cents per pound net, and a proportionately higher or lower price per ton as the price received by the plantation for sugar in New York might be more or less than four cents per pound. The appellee further covenanted and agreed that in the event of his failing to plant, cultivate, and bring to maturity cane upon all his available land, according to the direction and supervision of

the plantation for the said term, the plantation may enter into possession of the premises and grow, cultivate and harvest crops of sugar cane for the remainder of said term, charging reasonable prices for all labor and material furnished and crediting the appellee for the cane at the prices agreed to be paid therefor; and the appellee granted to the plantation "for the purposes of this agreement" free access to said land during the whole of said term. On the day of the date of that agreement the appellee addressed to the Hakalau Plantation Co. a letter saying "As I am unable at present to cultivate all of my Lot No. 33, Kaiwiki Homesteads, will you please furnish me with men and mules to do so, and I will pay for same on completion of my crop of cane." On the same day, or very shortly thereafter, an oral agreement was made between the appellee and the plantation by which the appellee agreed, as he testified, "to receive as my share of the cane five dollars per acre," meaning five dollars per acre of the cultivated area per annum. The appellee testified also that he thought it better to take five dollars an acre without the risk of going behind; that he was not prepared to cultivate the land himself; that he made no attempt to exercise any supervision over the land with reference to its cultivation; that he did not consider the written agreement, but only the verbal one which was to last as long as he wanted it; that neither he nor the plantation attempted to live up to the terms of the written agreement; that since July 24, 1907, the plantation has been planting cane on the land under the verbal agreement under which solely the parties have been acting; and that the verbal agreement is still in force. Counsel for the appellee contends that the oral agreement did not supplant the written agreement but merely modified it. Whatever may be the correct view to take of this matter we think the ultimate result would be the same. In either event the plantation was authorized by the appellee to at once enter into possession of the land and to grow, cultivate and harvest thereon crops of

cane for the term of four years, or indefinitely, paying the appellee five dollars per acre per annum for the use of the land. Under those circumstances the appellee would have no interest in the crops, the cane would belong to the plantation, and the appellee would be entitled to receive only what amounts to an agreed rental of five dollars per acre for the use of the land. It is not necessary to decide whether the situation constituted the relation of landlord and tenant between the parties, or whether the plantation acquired a license coupled with an interest, or some other form of right. See *McCandless* v. *John Ii Estate*, 11 Haw, 777, 790. Certain it is, however, that when the appellee for a valuable consideration gave to the plantation the right to enter upon the land and grow and harvest crops he transferred to the plantation, in so far as the limited nature of his estate permitted, an interest in the land which we hold amounted to an assignment of a part of his interest under the freehold agreement within the meaning of the prohibition contained in the agreement, and as the assignment was made without the consent of the commissioner of public lands, that condition was violated.

4. As to cultivation. One of the terms of the freehold agreement contained this clause: "Cultivation of not less than twenty-five per centum of the area of said premises * * * at any one time before the end of the third year." These are likewise the words of the statute. This question is quite intimately connected with that of assignment. It has been argued that the clause in question does not provide that the cultivation shall be done by the freeholder, and that as the land was under cultivation at the time the appellee acquired it, the condition was at once fulfilled. Although the clause does not expressly so state, it must be construed to mean that the cultivation is to be performed by the freeholder. We do not mean by this that it is necessarily to be done by the freeholder with his own hands, but that it must be done by him or by his servants

or agents for him. The crops grown must be his crops and not those of another. A different construction would not accord with the spirit and intent of those portions of the Land Act of 1895 (R. L. Chap. 22) relating to the homesteading of public lands of which the provisions relating to ":cash freeholds" are a part. The general purpose and intent of those portions of the statute may be briefly stated to be the settlement and occupation of agricultural and pastoral lands by citizen farmers, and the encouragement of the diversification of local industries, for the social, political and material benefit of the country. To this end it is required that the freeholder shall maintain his home upon the land taken up, and that he shall not assign or sublet his interest therein except with the consent of the commissioner. To this end also he is expected and required to cultivate the land for it is for that very purpose that he is supposed to have applied for it. It is with that object in view that the government offers such lands to settlers at less than their full value and requires them to make oath that they apply for the land solely for their own use and benefit. From what has been stated above with reference to the question of assignment it clearly appears that the appellee has not cultivated twenty-five per cent, or any other portion, of the land as required by the terms of his agreement. We, therefore, hold that in this respect also the appellee has not fulfilled the requirements of his agreement.

It has been urged upon us that it would be a great hardship upon the appellee should it be held that he is not entitled to receive a patent to the land. But the appellee had the law before him. If he did not understand it he should have sought advice. If he has acted pursuant to popular impression that title to public land may be acquired by a mere semblance of the performance of the conditions required by law to be performed he is the victim of an erroneous idea. In any event we have

only to expound the law as we find it—the consequences of our decision we cannot help.

The decree appealed from is reversed and set aside. A decree in conformity with this opinion will be entered in this court on presentation.

*Arthur G. Smith, Deputy Attorney General (Alexander Lindsay, Jr., Attorney General,* with him on the brief), for appellant.

*Harry Irwin* for appellee.