887 P.2d 656

**Herbert C. LEE, individually, and as Special Administrator of the Estate of Edward Jan Hop Lee, Plaintiff,**

v.

**Leonard ELBAUM, Defendant–Appellee, and John Does 1–10, Doe Partnerships, Corporations, Governmental Entities 1–10, and/or Other Entities 1–10, Defendants.**

**Rita Mae Ing LEE, individually, and as Special Administrator of the Estate of Edward J.H. Lee, deceased, Plaintiff–Appellant,**

v.

**Leonard ELBAUM, Defendant–Appellee, and John Does 1–10, Jane Does 1–10, Doe Partnerships 1–10, Doe Corporations 1–10, Roe "Non–Profit" Corporations 1–10, and Roe Entities 1–10, Defendants.**

No. 15353.

Intermediate Court of Appeals of Hawai'i.

March 10, 1993.

Reconsideration Denied March 31, 1993.

Certiorari Granted May 20, 1993.

Certiorari Dismissed as Improvidently Granted Jan. 26, 1995.

Henry N. Kitamura (with Scott E. Kubota on the briefs, Shim, Tam, Kirimitsu, Kitamura & Chang, of counsel), Honolulu, for plaintiffs-appellants.

David J. Dezzani (with Roy J. Tjioe on the brief, Goodsill Anderson Quinn & Stifel, of counsel), Honolulu, for defendant-appellee.

Before BURNS, C.J., and HEEN and WATANABE, JJ.

WATANABE, Judge.

In this wrongful death case, Plaintiff–Appellant Rita Mae Ing Lee (Appellant), the mother of Edward J.H. Lee (Decedent), ap-

peals, individually and as Special Administrator of Decedent's estate, from the First Circuit Court's March 28, 1991 judgment against her and Decedent's father, who was also appointed as Special Administrator of Decedent's estate (collectively, Plaintiffs),[1] and the April 26, 1991 order denying Appellant's motion for a new trial.

Appellant argues that the trial court committed reversible error in several respects. First, Appellant argues that the trial court should not have allowed Dr. Bruce Liebert (Liebert), a defense expert, to testify on the effect of a high-speed propeller blade hitting bone mass, since Liebert had previously testified during his deposition that he had "no trial opinions," and his trial testimony thus unduly surprised Plaintiffs.

Appellant also insists that it was error to allow another defense witness, Dr. Richard Grigg (Grigg), to comment on a television news video taken a few hours after the accident in question.

Third, Appellant asserts that the trial court erred in giving several jury instructions which she contends were not supported by the evidence.

Fourth, Appellant maintains that the trial court should have allowed Plaintiffs to introduce evidence at trial that Defendant Leonard Elbaum (Defendant) had a habit of operating his motorboat at high speeds.

Finally, Appellant argues that the trial court should have granted her motion for a new trial because it was undisputed that Defendant did not slow his boat down when he approached the divers in the water, and did not render aid after allegedly striking Decedent with his boat.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On June 8, 1986, Decedent and three friends, Guy Takazano (Takazano), Francis Mossman, and Ricky Fong, took Decedent's boat out in Maunalua Bay, O'ahu, anchored the boat about 1,000 feet from the number one buoy along the edge of the reef in the area to the right of the channel facing Diamond Head, put up a dive flag so that other boaters would know that there were divers in the water, and went snorkeling for octopus.

That same afternoon, Defendant and his wife, June Elbaum, set out with two friends, Bruce and Shari Bucky, for an afternoon boat ride in the vicinity of Maunalua Bay. As the group headed out of the channel going approximately twenty miles an hour, Takazano "just popped out of the water . . . right in the main channel," 3/11/91 Transcript at 162–63, and Defendant swerved his boat to avoid hitting Takazano. Shortly thereafter, Defendant spotted another diver in the water ahead of the boat. Defendant immediately cut the throttle back to neutral and turned the boat hard to the right, causing him to drop to one knee and the right edge of the cockpit to drop down to the water level. Defendant then turned the boat around to return to the second diver and noticed the diver's body floating face down amidst a pool of blood.[2]

Neither Defendant, nor any member of his party, attempted to rescue Decedent from the water. Instead, Defendant notified the Coast Guard, and everyone in his boat attempted to flag down help from other passing boaters.

The record indicates that Decedent had suffered an open skull fracture so deep that

1. Two separate actions were brought below and consolidated prior to trial. Case No. 86–2496 was brought by Herbert C. Lee (Decedent's father), individually and as Special Administrator of Decedent's estate, against Leonard Elbaum. Case No. 86–3585 was brought by Rita Mae Ing Lee (Decedent's mother), individually and as Special Administrator of Decedent's estate, also against Leonard Elbaum. Prior to trial, Decedent's father settled his individual claim for $50,-000 and filed a stipulation dismissing his individual claim with prejudice. Therefore, only the individual claim of Decedent's mother and the claims of Decedent's estate were litigated at the trial below. This appeal was brought solely by Decedent's mother, both in her individual capacity, and as Special Administrator of Decedent's estate.

2. At trial, Defendant vehemently testified that he did not overrun the diver's position and did not hit the diver. Defendant suggested that one of two Boston Whalers that he had earlier sighted in the vicinity of the divers was probably responsible for the accident in question.

his brain was exposed. He also suffered multiple lacerations to the left side of his head and body. Decedent was taken to shore by a boat that had been flagged down, and transported by ambulance to Queen's Hospital, where he was pronounced dead at 2:25 p.m.

Appellant and Decedent's father thereafter filed separate lawsuits against Defendant, the purported operator of the suspect motorboat, and these lawsuits were subsequently consolidated by stipulation of the parties.

A jury ultimately decided that Defendant was not responsible for Decedent's death, and judgment was entered accordingly. Appellant timely filed this appeal after her motion for a new trial was denied.

## DISCUSSION

### Admission of Testimony of Defense Expert Dr. Bruce Liebert

Appellant argues that the trial court reversibly erred when it allowed Defendant's expert, Dr. Bruce Liebert, to testify at trial that a propeller rotating at a high velocity would be significantly deformed after hitting bone mass. Appellant contends that Plaintiffs were unfairly surprised and prejudiced by such testimony because prior to trial, Liebert had testified at his deposition that he had formed "no trial opinions" since there were no plans to call him as a trial witness, and Plaintiffs were never subsequently notified, as required by Hawai'i Rules of Civil Procedure (HRCP) 26(e)(1), that Liebert's deposition testimony had changed. Appellant further contends that Liebert's testimony was highly prejudicial because it directly contradicted the testimony of her own expert, Dr. Laurence Thiboult, that a propeller would not be damaged after hitting a human skull.

The record on appeal reveals, however, that Appellant's counsel never objected at trial to Liebert's testimony until all questioning of Liebert had been completed and Liebert had left the witness stand. 3/11/91 Transcript at 144. Furthermore, Appellant did not move to strike Liebert's testimony until two days later, after the defense had already rested its case. 3/13/91 Transcript at

65. Thus the question arises whether Plaintiffs' objection to Liebert's testimony was "timely."

Hawai'i Rules of Evidence (HRE) 103(a) expressly provides that:

Error may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected, and:

(1) Objection: In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the ground was not apparent from the context[.]

HRE 103(a)(1) is identical to Federal Rules of Evidence (FRE) 103(a)(1). HRE 103 Commentary. In discussing the federal rule, Professors Wright and Graham state:

Rule 103(a)(1) requires that an objection be "timely." The sanction for failure to make a timely objection is the familiar sanction of nullity: that is, the untimely objection will be deemed to be no objection at all for purposes of review....

\*   \*   \*   \*   \*   \*

In administering the requirement that an objection be timely, the courts must consider both fairness and efficiency. The objector ought not to be held to an impossible standard such as requiring an objection before the ground becomes apparent to him. The opponent is entitled to have the objection raised at a time that permits him to best obviate the objection. Considerations of efficiency suggest that the objection should be made before time has been wasted introducing the evidence and while the court has some means of effectuating the objection that is more effective than ordering the jury to disregard the evidence. In each case, the court must balance these factors in arriving at a conclusion as to when the objection is timely made.

A good rule of thumb is found in Wigmore's Code:

An objection must be made as soon as the ground of it is known, or could reasonably have been known to the objector, *unless* some special reason makes

its postponement desirable for him and not unfair to the officer. * * *

This is usually taken to mean that objections to testimony must be made after the question but before the answer.

*       *       *       *       *       *

Of course, the motion to strike must also be timely. It should be made as soon as the ground for objection becomes apparent. The trial judge has discretion to entertain an untimely motion to strike, but if he refuses to do so, the objector cannot raise the point on appeal.

21 C. Wright and K. Graham, *Federal Practice and Procedure: Evidence* § 5037 at 187–90 (1977) (footnotes omitted).

■ The Hawai'i Supreme Court has not had occasion to determine what constitutes a "timely" objection or motion to strike for HRE 103 purposes. However, other courts have generally held that objections to evidence must be made when offered or when the grounds for objection become apparent, or they are deemed waived on appeal.

In *Wagner v. Wagner,* 1 Wash.App. 328, 461 P.2d 577 (1969), for example, the Washington Court of Appeals held that where allegedly improper testimony was not objected to until well into cross-examination, any error that may have occurred was waived. 1 Wash.App. at 333, 461 P.2d at 580. *See also, Blue Cross of Western New York v. Bukulmez,* 736 P.2d 834, 838 (Colo.1987), *Attorney Gen. of State v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 552–53, 685 P.2d 957, 960–61 (1984), *Belmont Indus., Inc. v. Bethlehem Steel Corp.,* 512 F.2d 434, 437 (3d Cir.1975).

■ In the instant case, Plaintiffs' counsel did not object to Liebert's testimony until after Liebert had been questioned on direct examination, cross-examination, and redirect examination. Furthermore, no motion to strike Liebert's testimony was made until two days later, after the defense had already rested its case and the court had already determined the instructions to be submitted to the jury. 3/13/91 Transcript at 65. Under the circumstances, it seems clear that Plaintiffs' objection to Liebert's testimony was untimely and was thus waived for appeal purposes.

### *Admission of Testimony of Defense Expert Dr. Richard Grigg*

One of the disputed issues at trial concerned the height of the ocean waves on the date of the fatal accident. Although Plaintiffs submitted evidence that the sea was calm and flat, Dr. Richard Grigg, Defendant's expert in oceanography, testified that based on his independent calculations, the waves in the bay that day were approximately three feet high. Grigg confirmed his opinion by referring to a channel 2 television news video, taken a few hours after the accident, which revealed the presence of whitecaps in the bay. The video's existence was discovered by Defendant and disclosed to Plaintiffs only after the trial had begun. Appellant therefore contends that Plaintiffs were unfairly surprised and prejudiced by Grigg's testimony. We agree that Grigg's testimony regarding the video unfairly surprised Plaintiffs and should have been disallowed by the trial court. However, based on our review of the record, we conclude that the error was harmless.

■ We note initially that the HRCP, which are patterned after the Federal Rules of Civil Procedure (FRCP), provide for very liberal pretrial discovery of an adverse party's experts. HRCP 26(b)(4)(A)(i), for example, specifically provides:

A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, *to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.* [Emphasis added.]

Additionally, HRCP 26(e)(1)(B) imposes a continuing obligation on a party to seasonably supplement responses to discovery requests regarding "the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony."

Prior to the adoption of the counterpart federal rules in 1970, the courts in most jurisdictions relied on three distinct grounds to prevent pretrial discovery of an adverse party's expert witnesses: the attorney-client privilege, the "work product" doctrine, and the so-called "unfairness" rule. Friedenthal, *Discovery and Use of an Adverse Party's Expert Information,* 14 Stan.L.Rev. 455 (1962). This practice of nondisclosure was criticized by some legal scholars [3] and prompted the adoption of FRCP 26(b)(4)(A)(i) and 26(e)(1)(B) and the liberalization of pretrial discovery of experts.

In explaining the reason for the adoption of FRCP 26(b)(4)(A)(i), the 1970 Advisory Committee on Civil Rules commented:

Subsection (b)(4)(A) deals with discovery of information obtained by or through experts who will be called as witnesses at trial. The provision is responsive to problems suggested by a relatively recent line of authorities. Many of these cases present intricate and difficult issues as to which expert testimony is likely to be determinative....

In cases of this character, a prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation. The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand. A California study of discovery and pretrial in condemnation cases notes that the only substitute for discovery of experts' valuation materials is "lengthy—and often fruitless—cross-examination during trial," and recommends pretrial exchange of such materials. Similarly, effective rebuttal requires advance knowledge of the line of testimony of the other side. If the latter is foreclosed by a rule against discovery, then the narrowing of issues and elimination of surprise which discovery normally produces are frustrated.

Advisory Committee Note of 1970 to Amended Subdivision (b) of FRCP 26, 28 U.S.C.A. Rule 26 at 29 (citations omitted).

■ The Committee also noted that FRCP 26(e)(1)(B), insofar as it imposes a continuing burden on a party to supplement responses to discovery requests regarding expert witnesses, was made "in order to carry out the provisions of Rule 26(b)(4)." *Id.* at 33. The history of FRCP 26, which is highly persuasive in construing HRCP 26, *Ellis v. Crockett,* 51 Haw. 45, 60–61, 451 P.2d 814, 824 (1969), thus makes it abundantly clear that complete and accurate pretrial discovery of expert witnesses is critical to a fair trial, and HRCP 26 is designed to promote candor and fairness in the pretrial discovery process and to eliminate surprises at trial. With this background in mind, we turn to an examination of Grigg's trial testimony.

■ The record reveals that the defense counsel notified Plaintiffs of the existence of the video only after trial had begun. Moreover, Plaintiffs were not made aware of

3. For example, Professor Friedenthal, in explaining why complete and accurate pretrial discovery of expert witnesses was critical to a fair trial, wrote:

It is fundamental that opportunity be had for full cross-examination, and this cannot be done properly in many cases without resort to pretrial discovery, particularly when expert witnesses are involved. Unlike two eyewitnesses who disagree, two experts who disagree are not necessarily basing their testimony on their views of the same objective features. Instead they may rely on entirely separate data, since the theoretical bases underlying their respective approaches may differ radically. Before an attorney can even hope to deal on cross-examination with an unfavorable expert opinion he must have some idea of the bases of that opinion and the data relied upon. If the attorney is required to await examination at trial to get this information, he often will have too little time to recognize and expose vulnerable spots in the testimony. He may need advice of his own experts to do so and indeed, in certain cases, his experts might require time to make further inspections and analyses of their own. Friedenthal, *Discovery and Use of an Adverse Party's Expert Information,* 14 Stan.L.Rev. 455, 485 (1962) (footnote omitted). Professor Friedenthal's analysis of the trial problems flowing from lack of discovery of expert witnesses was specifically referred to by the 1970 Advisory Committee on Civil Rules when it drafted FRCP 26(b)(4)(A)(1). Advisory Committee Note of 1970 to Amended subdivision (b) of FRCP 26, 28 U.S.C.A. Rule 26 at 30.

Grigg's proposed testimony regarding the video until the day on which Grigg was to actually testify. As a result, Plaintiffs had no opportunity to investigate the conditions under which the video was filmed, nor the circumstances for the filming of the video. More importantly, Plaintiffs were given no time to prepare for full cross-examination of Grigg. This is precisely the sort of trial by surprise which HRCP 26 was designed to avoid. We agree with Appellant, therefore, that Grigg's testimony regarding the video unfairly surprised Plaintiffs and should have been disallowed by the trial court.

■ "Nevertheless, a new trial will not be granted on the ground that surprise evidence was admitted unless the moving party was prejudiced." *Erskine v. Consol. Rail Corp.*, 814 F.2d 266, 272 (6th Cir.1987). In order to prevail on a motion for a new trial, Appellant must show that she "was prejudiced and that failure to grant a new trial is inconsistent with substantial justice." *Id.*

In the instant case, Appellant asserts prejudice by the video testimony because it "was at odds with the testimony of Mike Sur who said that the ocean on the date of the accident was calm, flat and with no white caps." Opening Brief at 21.

However, the record indicates that prior to testifying about the video, Grigg had already buttressed his opinion about the wave height on the date of the accident by referring to a photograph, Defendant's Exhibit 7, taken on the day of the accident. He stated that:

> One can tell there is [sic] waves breaking on the reef but you can't tell how big they are. For one thing that was taken at one second of time and could have been a lull. At least there is [sic] some waves breaking out there. It's half mile out and it's pretty hard to tell how big they are. I mean all you can see is they're [sic] waves breaking on the reef there and it's not easy to tell [the size of the waves] on that.

3/12/91 Transcript at 103–04. It is apparent, therefore, that while the picture does not reveal the actual height of the waves, it does reveal, contrary to Mike Sur's testimony, that there were waves in the bay that day.

Moreover, Grigg testified that the *Surf News Network* and *The Honolulu Advertiser* had both confirmed his opinion regarding the height of the waves. *Id.* at 102.

In view of the record, any prejudice that Appellant may have suffered as a result of the video testimony is, in our view, harmless.

### Jury Instructions

■ This court has stated that:

> The law is clear that it is error to instruct a jury on a state of facts not supported or warranted by the evidence adduced at trial[,] and such an error is, of course, presumptively harmful unless it appears from the record as a whole that the error was not prejudicial.

*Tanuvasa v. City & County of Honolulu*, 2 Haw.App. 102, 116, 626 P.2d 1175, 1185 (1981) (citations omitted).

Appellant contends that three instructions read to the jury by the trial court were not supported by the evidence and were thus erroneous. Appellant also maintains that the trial court erred in instructing the jury about a boating rule promulgated by the State Department of Transportation which, Appellant claims, as a matter of law, did not apply to Decedent.

We find no merit to Appellant's contentions.

### A. The "Emergency Situation" Instruction

The trial court instructed the jury as follows:

> Violation of an ordinance or regulation or rule may be considered by you as evidence of negligence, unless the violation is excused. A violation is excused where the [D]efendant was unable to comply with the ordinance or regulation or rule although he exercised reasonable diligence and care; *or where [D]efendant was confronted with an emergency situation not caused by his own conduct.*
>
> \*     \*     \*     \*     \*     \*
>
> The Hawaii [Hawai'i] Administrative Rules state that it is the duty of the operator of a boat involved in a boating accident so far as he can do so without serious

danger to his own vessel or persons aboard to render aid and assistance as may be practicable and necessary to save them from or minimize any danger caused by the accident.

3/14/91 Transcript at 18 (emphasis added).

Appellant argues that the emergency situation instruction was erroneously given because Defendant clearly violated the quoted boating regulation by not going to Decedent's aid following the boating accident. Furthermore, Appellant argues that there was no evidence of an emergency situation, not caused by Defendant's own conduct, that could have excused Defendant's violation of the regulation. Opening Brief at 26.

■ Our review of the record, however, reveals sufficient evidence to warrant the instruction. Defendant testified that on the day of the accident, there were "three to five" foot waves in the bay, which interfered with the visibility of objects in the trough between two waves. Defendant testified that he received no warning that Decedent was snorkeling in the boat's path until Defendant's boat was almost upon him. At that point, Defendant immediately "cut the throttle back to neutral" and "spun the wheel right hard." 3/11/91 Transcript at 166–67. Furthermore, the evidence indicates that Decedent was snorkeling in a dark wet suit, with no dive flag in the vicinity, and his presence in the water was not immediately obvious. Based on these facts, the jury was properly allowed to consider whether Defendant had been confronted with an emergency situation, not caused by his own conduct, that may have excused his violation of a rule.

### B. *The "Dive Flag" Instruction*

The trial court instructed the jury that they could consider whether Decedent or Defendant "failed to follow any applicable Hawai'i Administrative Rules (HAR)," in determining whether either was negligent and that "all persons in the State of Hawai'i have a duty to follow the Hawai'i Administrative Rules of Boating established by the Department of Transportation of the State of Hawai'i, Harbors Division, and such rules have the force and effect of law." 3/14/91 Transcript at 18. Over Appellant's objection, the trial court then read to the jury the following

portion of a state boating rule, HAR § 19–76–9, which had been promulgated by the State of Hawai'i, Department of Transportation:

A red flag with a white diagonal running from the upper left hand corner to the lower right hand corner from masthead to lower outside corner and known as the divers flag shall, when displayed on the water, indicate the presence of a person engaged in underwater swimming or diving in the immediate area.

No person shall engage in underwater swimming or diving using self[-]contained underwater breathing apparatus or other artificial breathing device in navigable waters of the State without marking his position with the divers flag. No person when so engaged shall knowingly surface more than 50 feet from such marker, except in cases of emergency.

\* \* \* \* \* \*

Recognition of the divers flag by regulation shall not be construed as conferring any rights or privileges upon its users, and its presence in a given water area shall not be construed in itself as restricting the use of the water area so marked. Operators of vessels shall, however, exercise precaution commensurate with conditions indicated.

*Id.* at 20–21.

Appellant contends that the above instruction should never have been given to the jury for two reasons. First, HAR § 19–76–9 does not apply to the facts of this case because Decedent was "snorkeling" rather than "diving" on the fateful day in question, and a "snorkel" does not qualify as an "artificial breathing device," for purposes of the rule. Appellant argues that the interpretation of a regulation or the definition of a term in the regulation is a question of law, not a question of fact, and, therefore, the trial court committed reversible error when it allowed the jury to determine whether Decedent had violated HAR § 19–76–9. Second, Appellant insists that no evidence was presented to the trial court to show that Decedent knowingly surfaced more than fifty feet from his dive flag and violated the rule.

We find no error.

■ "The function served by jury instructions is to inform the jury of the law *applicable* to the current case," *Tittle v. Hurlbitt,* 53 Haw. 526, 530, 497 P.2d 1354, 1357 (1972) (emphasis added), and "to inform the jury of its function, which is the independent determination of the facts, and the application of the law, as given by the court, to the facts found by the jury." 2 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 485 at 711 (1982). Therefore, a jury charge "should be a concise statement of the claims of the parties, the issues of fact that the jury must decide, and the applicable law[.]" *Id.*

■ Thus, where an alleged violation of a rule having the force and effect of law has been raised by one of the parties, the jury should be instructed about the applicable rule, and then instructed to apply the law in determining the question of negligence. *Sherry v. Asing,* 56 Haw. 135, 149, 531 P.2d 648, 658 (1975).

Applying the foregoing principles to the instant case, we believe that the trial court correctly took judicial notice of HAR § 19-76-9, determined that it was applicable to the facts presented at trial, and allowed subsections (a) through (d) of the rule to be read to the jury and considered by the jury in determining negligence.

HAR § 19-76-9 clearly requires that any person engaging in "underwater swimming or diving using self-contained underwater breathing apparatus or other artificial breathing device" must "mark[ ] his position with the divers flag." The first paragraph of the rule expressly provides that "when displayed on the water," the dive flag shall "indicate the presence of a person engaged in underwater swimming or diving in the immediate area."

■ In interpreting administrative rules:

The general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

*International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citations omitted). Moreover, an administrative agency's interpretation of its own rules is entitled to "deference unless it is plainly erroneous or inconsistent with the underlying legislative purpose." *Id.*

■ In view of the foregoing principles, HAR § 19-76-9 plainly applies to a snorkeler such as Decedent.

Webster's New World Dictionary defines "snorkel" as "a breathing tube extending above the water, used in swimming just below the surface." Webster's New World Dictionary of the American Language 566 (1979). The same dictionary also defines the word "artificial" as "made by human work or art; not natural." *Id.* at 34. Since a snorkel is plainly a "breathing device" used for underwater swimming, which is man-made and not a natural extension of one's body, it follows that a snorkel is an "artificial breathing device" within the plain meaning of the rule.

Moreover, this plain meaning of HAR § 19-76-9 is consistent with its administrative interpretation, which is entitled to great deference. At trial, parts of the deposition of Mr. David Parsons, the state boating manager for the Hawai'i Department of Transportation, Harbors Division, which administered HAR § 19-76-9, were read into evidence. Mr. Parsons testified unequivocally that "the purpose of the flag is to be readily visible by the boats in the vicinity," 4/17/90 Deposition at 47, 3/13/91 Transcript at 3, and that the term "artificial breathing device," as used in HAR § 19-76-9 included a snorkel. *Id.* at 55.

Since HAR § 19-76-9 clearly applies to snorkelers, it was the duty of the trial court to instruct the jury about the rule, as long as the evidence adduced at trial raised the inference that the rule was violated.

■ In reviewing the record in this case, we find sufficient evidence to support the inference. Appellant's witness, Takazano,

testified that Decedent's boat, upon which a dive flag was hoisted, was anchored about 1,000 feet from the number one buoy, which sat at the head and center of the entrance of the channel leading into and out of Maunalua Bay. He also testified that he and Decedent were both diving seaward of the marker on the day in question, and that Decedent was approximately 100 yards away from Takazano when the accident occurred. The evidence presented at trial also indicated that shortly after the accident, Takazano told police officers that he was seventy-five feet from Decedent's boat at the time of the accident and Decedent was "another 100 yards" seaward of him. In addition, Defendant, June Elbaum, and Shari Bucky all testified that Decedent's boat, where the dive flag was located, was at least one-quarter to one-half of a mile from where the accident occurred—from where Decedent surfaced.

Hence, there was sufficient evidence for the trial court to properly instruct the jury about the dive flag rule.

## C. Interference with Vessels or Navigation Instruction

Appellant contends that there was no evidence to support the following instruction by the trial court:

No person shall engage in underwater swimming or diving in a manner which shall unreasonably or unnecessarily interfere with vessels or with free and proper navigation of the waterways of the State. Such diving or swimming in narrow or otherwise restricted channels shall constitute such interference, if unreasonable under the circumstances.

HAR § 19–76–9.

We disagree with Appellant. The trial testimony indicates that Decedent was found in the vicinity of the number one buoy, which marks the entrance and exit of the channel leading into and out of Maunalua Bay. Since the buoy designates the point at which it is safe for boats to enter and exit the bay, it was proper for the jury to consider whether Decedent interfered with the free navigation of vessels in the bay.

### Testimony Regarding Defendant's Prior Acts of Speeding

Appellant contends that the trial court erroneously excluded testimony that Defendant had a "habit" of speeding his motorboat in the marina and in the channel over several days prior to the accident.

We agree with the trial court that the proferred testimony constituted character evidence of prior bad acts, which was inadmissible under HRE 404(b), and not habit evidence, which was admissible under HRE 406.

Under HRE 404(a), evidence of a person's character or a trait of his character is generally inadmissible to prove that the person acted in conformity therewith on a particular occasion. Moreover, HRE 404(b) specifically provides that:

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

The Commentary to HRE 404, which, pursuant to HRE 102.1, may be used "as an aid in understanding the rules," explains the reasoning for prohibiting character evidence:

Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good [person] and to punish the bad [person] because of their respective characters despite what the evidence in the case actually showed happened. [Citations omitted.]

In Feliciano v. City and County of Honolulu, 62 Haw. 88, 611 P.2d 989 (1980), the Hawaii Supreme Court discussed the inadmissibility of character evidence in civil cases, noting that:

[i]t is well-settled that evidence of the good or bad character of either party to a civil action is generally inadmissible. Such evidence is regarded as too remote to be of substantial value, as tending to confuse the issues and unduly protract the trial and, most important, as offering a temptation to the jury to reward a good life or punish a bad one instead of deciding the issues before them.

62 Haw. at 91, 611 P.2d at 991 (citations omitted).

■■■■ The admissibility of habit evidence, on the other hand, is governed by HRE 406, which provides in relevant part that:

[e]vidence of the habit of a person ... whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person ... on a particular occasion was in conformity with the habit....

The Commentary to HRE 406 addresses the distinction between character and habit evidence as follows:

Character and habit are closely akin. Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait.... *A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct,* such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving.... When disagreement has appeared, its focus has been upon the question what constitutes habit, and the reason for this is readily apparent. The extent to which instances must be multiplied and consisting of behavior maintained in order to rise to the status of habit inevitably gives rise to differences of opinion.... While adequacy of sampling and uniformity of response are key factors, precise standards for measuring their sufficiency for evidence purposes cannot be formulated. [Emphasis added.]

In determining whether a person's conduct is sufficiently routine to constitute a habit, several decisions from other jurisdictions are instructive.

In *Frase v. Henry,* 444 F.2d 1228, 1232 (10th Cir.1971), two witnesses were allowed to testify that the deceased driver was "a good driver who did not drive over the speed limit but usually drove five miles per hour under the limit[,]" and "was ... cautious, obeyed the rules of the road, and ... never drove over 60 miles per hour." In holding such testimony admissible as habit evidence,

the Tenth Circuit Court of Appeals distinguished between character and habit evidence as follows:

"Character" is a generalized description of one's disposition in respect to a general trait such as honesty, temperance, or carefulness, while "habit" is more specific. The latter designates a regular practice of meeting a particular kind of situation with a certain type of conduct, or a reflex behavior in a specific set of circumstances. Evidence of habit or custom is relevant to an issue of behavior on a specific occasion because it tends to prove that the behavior on such occasion conformed to the habit or custom.

*Id.* The court pointed out that if the testimony had merely been that the deceased was a careful, cautious man, such evidence would not have been specific enough to be admissible as habit evidence. *Id.* However, testimony regarding the deceased's care in driving, his practice of driving under the speed limit, and his regard to the rules of the road, was testimony which devolved into specific aspects of the deceased's conduct and demonstrated "a regular practice of meeting a particular kind of situation with a specific type of conduct." *Id.*

Similarly, in *Charmley v. Lewis,* 302 Or. 324, 729 P.2d 567 (1986), the Oregon Supreme Court affirmed a trial court's decision allowing six witnesses to testify that a pedestrian always used the same particular route when he walked to the grocery store and invariably used a particular crosswalk in crossing a street at a certain intersection. In ruling that the challenged testimony constituted habit evidence, the court discussed three elements of habit evidence, only two of which are set forth here due to the uniqueness of Oregon's Rules of Evidence.

■■■■ First, the evidence must be the regular practice of a person responding to a particular kind of situation. In this regard, "the practice must be frequent, and it must be invariable or, at least, consistent." 302 Or. at 329, 729 P.2d at 570. Second, the habit must be specific. The court noted that:

[t]he specificity requirement is the primary tool for weeding out character evidence

when it is offered as habit evidence. For example,

> [a] person's tendency to be accident-prone, or habitually careful, is probably too general to satisfy the definition of habit. However, a driver's behavior in always using a hand signal in addition to a turn signal or always traveling a particular route to the office may satisfy the specificity requirement.

302 Or. at 330, 729 P.2d at 570 (citations omitted).

▉ In the instant case, we are satisfied that the trial court properly exercised its discretion to disallow testimony that Defendant had sped his boat in the marina and in the channel "over several days" prior to the accident. There was no offer of proof as to Defendant's "specific" speed on those occasions and indeed the evidence indicated that there was no speed limit imposed on boaters in the channel. Moreover, there was no offer of proof that Defendant had a "regular" and "invariable" practice of driving his boat at a particular speed.

### Denial of Motion for New Trial

Appellant argues that the jury's verdict was against the weight of the evidence and, therefore, the trial court should have granted her motion for a new trial. Specifically, Appellant contends that the following undisputed evidence of Defendant's negligence was presented to the jury:

1. Defendant "admitted that he was traveling more than 5 knots per hour within 200 feet of Decedent," which the HAR on boating prohibit;

2. Defendant failed to render aid to Decedent as required by HAR § 19–73–1; and

3. Defendant turned his boat to the right upon spotting Decedent to the left of his boat's path and caused his propellers to swing toward Decedent instead of away from him.

▉ On appeal, a denial of a motion for new trial is reviewed for abuse of discretion, *Harkins v. Ikeda*, 57 Haw. 378, 380, 557 P.2d 788, 790 (1976), which we find absent from this case.

▉ Regarding Appellant's allegation that Defendant was speeding within 200 feet of Decedent, there is also evidence on the record that Defendant did not strike Decedent, was not aware that Decedent was snorkeling in the water ahead of his boat, and acted reasonably in piloting his boat.

Turning to Appellant's second contention, the evidence indicates that Decedent died of "craniocerebral injuries due to trauma," rather than drowning, and, therefore, Defendant's duty to render aid would not be relevant. Furthermore, the evidence indicates that Defendant did notify the Coast Guard about the accident, attempted to summon help from boaters in the area, and did not attempt to pull Decedent's body out of the water because: (1) he was almost seventy years of age and the sides of his boat were too high to properly lift a body out of the water; (2) the "swim step" on the boat, which was closer to the water and which he could possibly have stepped on to recover the body, was in the back of the boat, and he was afraid to back the boat into Decedent's body and risk hitting the body with the propellers; and (3) there was blood in the water, and he was concerned that sharks might be attracted to the area.

Finally, we disagree with Appellant's contention that the undisputed evidence at trial was that Defendant turned his boat the wrong way upon sighting Decedent. First of all, such evidence would be irrelevant if the jury believed Defendant's adamant testimony that his boat never struck Decedent. Moreover, Defendant testified that he "[cut] the throttle spinning hard to the right" because "it seemed the most prudent thing to do at the time because it gave us the most area to stay away from the person who was out there." 3/11/91 Transcript at 167–68. He also testified that the design of the boat enabled him to safely make the turn. Finally, although Mr. Don Vehon, Appellant's expert, testified that students are taught in Coast Guard School to turn their boat toward an object in front of their boats to avoid hitting it with the boat's propellers, he also admitted, on cross-examination, that this action might result in hitting the object with the boat's hull rather than the engine.

In light of the evidence, we cannot conclude that the trial court abused its discretion in denying Appellant's motion for a new trial.

## CONCLUSION

Accordingly, we conclude that the record does not support Appellant's contentions that the trial court committed reversible errors regarding the admission and exclusion of certain evidence and the reading of certain jury instructions over Appellant's objections. We also conclude that the trial court did not abuse its discretion in denying Appellant a new trial.

Affirmed.