921 P.2d 169

**Caroline RICHARD nka Caroline Jackson, Plaintiff–Appellant,**

v.

**Wayne C. METCALF, III [1]; Department of Commerce and Consumer Affairs, Insurance Division, State of Hawai'i, Defendants–Appellees,**

and

**John Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; and Doe Entities 1–10, Defendants.**

**No. 18257.**

Supreme Court of Hawai'i.

July 23, 1996.

1. Wayne C. Metcalf, III, succeeded Lawrence M. Reifurth as the Insurance Commissioner of the State of Hawai'i during the pendency of this action. Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Metcalf has been substituted automatically for Reifurth as the Defendant–Appellant in the instant case.

Joseph L. Wildman (Guy A. Sibilla of Sibilla & Wildman, with him on the briefs), Honolulu, for plaintiff-appellant.

David A. Webber and John W. Anderson, Deputy Attorneys General, on the briefs, Honolulu, for defendants-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

Plaintiff–Appellant Caroline Jackson appeals from the first circuit court's order denying her motion for summary judgment and granting the summary judgment motion filed by the Defendants–Appellees Wayne C. Metcalf, III, and the Department of Commerce and Consumer Affairs, Insurance Division, State of Hawai'i (DCCA). The threshold issue presented in this appeal is whether Jackson has standing to challenge Hawai'i Administrative Rule (HAR) § 16–23–93 [2] under Hawai'i Revised Statutes (HRS) § 91–7 (1993).[3]

## I. BACKGROUND

The Appellees acknowledge that no material facts are disputed in this case. Jackson was injured on November 8, 1991, while riding as a passenger in an automobile driven by Maria Wong. Jackson subsequently filed a no-fault claim with Wong's insurer, State Farm Insurance Companies (State Farm).

---

**2.** HAR § 16–23–93 provides:

*Fee schedules.* Subject to the time limitation set forth in section 431:10C–315, HRS, this subchapter shall apply to treatment occurring after May 31, 1993, regardless of when the accident causing the injury occurred. Charges and treatment rendered for emergency services during the initial seventy-two hours following the motor vehicle accident resulting in injury shall not be subject to this subchapter; provided, however, that charges for emergency treatment shall not exceed the provider's usual and customary fee and shall be appropriate, reasonable, and necessarily incurred. Charges for treatment of a primarily palliative nature shall be subject to the requirements of this subchapter in the same manner as any other treatment.

**3.** HRS § 91–7 provides:

(a) Any interested person may obtain a judicial declaration as to the validity of an agency rule as provided in subsection (b) herein by bringing an action against the agency in the circuit court of the county in which the petitioner resides or has its principal place of business. The action may be maintained whether or not petitioner has first requested the agency to pass upon the validity of the rule in question.

(b) The court shall declare the rule invalid if it finds that it violates constitutional or statutory provisions, or exceeds the statutory authority of the agency, or was adopted without compliance with statutory rulemaking procedures.

State Farm began paying her no-fault expenses associated with the aforesaid motor vehicle accident.

On May 13, 1993, State Farm advised Jackson's treating physician, Peter Diamond, M.D., that he was required to submit a treatment plan for his patient pursuant to the no-fault law, as amended. HRS §§ 431:10C–308.5 and –308.6 (1993).[4] Counsel for Jackson stepped in when State Farm apparently withheld approval of a magnetic resonance image (MRI) exam requested by Dr. Diamond. The MRI results eventually obtained by Dr. Diamond suggested a tear in Jackson's left knee; therefore, Dr. Diamond formally requested permission to proceed with arthroscopic surgery. On December 29, 1993, State Farm submitted a challenge for submission to peer review under HRS § 431:10C–308.6.

Believing that she was not subject to the peer review procedures because her injury occurred prior to the effective date of the 1992 amendments, *see* 1992 Haw. Sess. L. Acts 123 and 124, at 202–19,[5] Jackson filed a declaratory judgment action under HRS § 91–7. The circuit court found and concluded that Jackson lacked proper standing "insofar as she has not suffered any harm or injury with respect to the statutes and/or rule(s) at issue." Accordingly, the court denied Jackson's motion for summary judgment and granted the Appellees' motion to dismiss or for summary judgment.[6]

---

4. HRS § 431:10C–308.5(b) provides in pertinent part:

> Effective January 1, 1993, the charges and frequency of treatment for services specified in section 431:10C–103(10)(A)(i) and (ii) ... shall not exceed the charges and frequency of treatment permissible under the workers' compensation schedules, except as provided in section 431:10C–308.6.... The Commissioner may adopt administrative rules relating to fees or frequency of treatment for injuries covered by no-fault benefits. If adopted, these administrative rules shall prevail to the extent that they are inconsistent with the workers' compensation schedules.

HRS § 431:10C–308.5(a) defines the term "workers' compensation schedules" to mean "the schedules adopted and as may be amended by the director of labor and industrial relations for workers' compensation cases under chapter 386, establishing fees and frequency of treatment guidelines, and contained in ... [HAR §§ ] 12–13–30, 12–13–35, 12–13–38, 12–13–39, 12–13–45, 12–13–85 through –92, and 12–13–94[.]"

HRS § 431:10C–308.6 provides in pertinent part:

> (a) Charges and treatment in excess of fee schedules or treatment guidelines shall be governed by this section. The fee schedules or treatment guidelines may be exceeded if a provider of treatment or rehabilitative services finds that the nature of the injuries and the process of recovery require a treatment plan resulting in fee schedules or treatment guidelines to be exceeded. If an insurer desires to challenge treatment or rehabilitative services in excess of the fee schedules or treatment guidelines, the insurer may do so by filing, within five working days of a request made pursuant to subsection (d), a challenge with the commissioner for submission to a peer review organization as provided in this section.
>
> ....
>
> (d) A provider may request prior approval from the insurer for treatment exceeding the workers' compensation schedules or treatment guidelines. The request shall include a treatment plan with a time schedule of measurable objectives and an estimate of the total cost of services. The insurer shall respond to such a request within five working days of mailing of the request, giving authorization or stating in writing the reasons for refusal to the provider and the insured. Any such refusal shall be filed concurrently for submission to the peer review organization. Failure by the insurer to respond within five working days shall constitute approval of the treatment.

5. Act 123, § 7 and Act 124, § 15 provide that:

> The provisions of this Act do not affect rights, duties, or actions that are based upon events or acts which have taken place prior to the effective date of this Act, or the effective date of any provision of this Act, nor to penalties that were incurred or proceedings begun before the effective date of this Act.

1992 Haw. Sess. L. Act 123, § 7 at 209–10; *id.* Act 124, § 15 at 218. The respective effective dates for Acts 123 and 124 relevant to the instant appeal are as follows:

> SECTION 10. This Act [123] shall take effect upon its approval; provided that:
> (1) The provisions in Section 1 relating to ... fee schedules (section 431:10C–B) ... [and] peer review (section 431:10C–C) ... shall take effect on January 1, 1993.
>
> ....
>
> SECTION 18. This Act [124] shall take effect upon its approval except sections 7, 8, 9, and 11 shall take effect on January 1, 1993[.]

1992 Haw. Sess. L. Act 123, § 10 at 209–10; *id.* Act 124, § 18 at 219.

6. Hawai'i Rules of Civil Procedure (HRCP) Rule 12(c) provides in pertinent part that, "[i]f ... matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment[.]"

## II. *STANDARDS OF REVIEW*

On appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

*Harris v. DeSoto*, 80 Hawai'i 425, 431, 911 P.2d 60, 66 (1996) (quoting *Heatherly v. Hilton Hawaiian Village Joint Venture*, 78 Hawai'i 351, 353, 893 P.2d 779, 781 (1995)).

The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo*. In addition, our foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.

*State v. Baron*, 80 Hawai'i 107, 113, 905 P.2d 613, 619, *reconsideration granted in part and denied in part*, 80 Hawai'i 187, 907 P.2d 773 (1995) (citation omitted). However, "we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history." *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73, *reconsideration denied*, 78 Hawai'i 474, 896 P.2d 930 (1995) (internal brackets, ellipsis points, and citation omitted).

"If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute and the rule implements nor produces an absurd or unjust result, courts [will also] enforce the rule's plain meaning." *Lee v. Elbaum*, 77 Hawai'i 446, 457, 887 P.2d 656, 667 (App.1993) (citing *International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel.*

*Co.*, 68 Haw. 316, 323, 713 P.2d 943, 950 (1986)), *cert. granted*, 74 Haw. 651, 853 P.2d 542 (1993), *cert. dismissed*, 77 Hawai'i 489, 889 P.2d 66 (1995). Finally, "judicial deference to agency expertise ... [is] a guiding precept where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are the subject of review." *Vail v. Employees' Retirement Sys.*, 75 Haw. 42, 59, 856 P.2d 1227, 1237, *reconsideration denied in part*, 75 Haw. 580, 861 P.2d 735 (1993) (citation omitted).

## III. *DISCUSSION*

█ Jackson claims that she is an "interested person" under HRS § 91–7 because she "has [suffered] and will continue to suffer injury" as a result of the decision to deny her arthroscopic surgery. The Appellees characterize Jackson's claims as a mere "academic disagreement" and further argue that her substantive rights as a no-fault insurance claimant have not been affected by HAR § 16–23–93. In the alternative, the Appellees contend that HAR § 16–23–93 is not retrospective and that the legislature did not preclude application of the workers' compensation guidelines and peer review process to treatment rendered after January 1, 1993 for injuries suffered prior to that date. We agree with Jackson and therefore reverse the circuit court's order granting summary judgment in favor of the Appellees and remand for entry of summary judgment in favor of Jackson.

### A. *Standing Requirements Under HRS § 91–7*

In *Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 623 P.2d 431 (1981), this court considered the standing criteria applicable in declaratory judgment actions brought under HRS § 91–7:

HRS § 91–7 authorizes "interested persons" to seek declarations on the validity of agency rules. Life of the Land and its members challenge the legality of the procedures followed by the Land Use Commission in the boundary review. The orders of the commission governing pro-

cedural aspects of the review are arguably agency rules. As plaintiffs are endowed with interests that may have been adversely affected, they undoubtedly are "interested persons." Moreover, plaintiffs were deemed "aggrieved persons" in a prior case with similar allegations ..., [*see Life of the Land v. Land Use Comm'n*, 61 Haw. 3, 594 P.2d 1079 (1979),] and further discussion here relative to their status as "interested persons" would definitely be redundant.

63 Haw. at 177–78, 623 P.2d at 441 (footnotes omitted). In other words, someone who would have, or already has, qualified as an "aggrieved person" under HRS § 91–14 (1993) certainly qualifies as an "interested person" under HRS § 91–7. As it had done in the 1979 case involving the same parties and brought under HRS § 91–14, Life of the Land

> made a prima facie showing that three of its members reside in the immediate vicinity of the [lands at issue], ... that members use the area for diving, swimming, hiking, camping, sightseeing, horseback riding, exploring, and hunting and for aesthetic, conservational, occupational, professional and academic pursuits, and that future urbanization will destroy beaches and open space now enjoyed by members and decrease agricultural land presently used for the production of needed food supplies. [Life of the Land] contends that construction will have an adverse effect on its members and on the environment, and that pursuits presently enjoyed will be irrevocably lost.

*Id.* at 176 n. 9, 623 P.2d at 440 n. 9 (quoting *Life of the Land*, 61 Haw. at 8, 594 P.2d at 1082).

■ Accordingly, this court rejected the Land Use Commission's argument that Life of the Land was merely asserting generalized interests in its HRS § 91–7 declaratory judgment action. *Id.* at 176–77 & n. 10, 623 P.2d at 441 & n. 10.[7] When a claimant "seek[s] to do no more than vindicate [its] own value preferences through the judicial process[,]" *Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972), and therefore fails to show any actual or threatened injury, that person does not have standing to bring HRS § 91–7 actions in the circuit court. *Compare Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 283, 768 P.2d 1293, 1299 (1989), *with Waianae Model Neighborhood Area Ass'n, Inc. v. City & County*, 55 Haw. 40, 44, 514 P.2d 861, 864 (1973).[8] However, this court did not further elaborate upon the standing requisites established under HRS § 91–7.

■ In *Bush v. Watson*, 81 Hawai'i 474, 918 P.2d 1130 (1996), *reconsideration denied* 82 Hawai'i 156, 920 P.2d 370 (1996), we applied the "injury in fact" test to determine the standing of a party who had filed a declaratory judgment action under HRS § 91–7. Under this test, the claimant must demonstrate that: "(1) he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable decision would likely provide relief for a plaintiff's injury." *Id.* at 479, 918 P.2d at 1135. *See also Pele Defense Fund v. Paty*, 73 Haw. 578, 591–95,

---

**7.** This court identified article XI, section 9 of the Hawai'i Constitution as the source of the "personal and special interests or 'rights[]'" asserted in *Life of the Land*.

> Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources. *Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.*

Haw. Const. art. XI, § 9 (1978) ("Environmental Rights") (emphasis added).

**8.** In *Anderson*, this court held that the asserted injury to the plaintiffs—*viz.*, that additional funds would have to be found to pay for environmental studies and other low- and moderate-income housing developments as a result of the defendant's allegedly illegal use of public money—merely reflected a difference of political priorities and not the assertion of a legal right. 70 Haw. at 283, 768 P.2d at 1299. In *Waianae Model Neighborhood*, this court held that the plaintiff had standing to seek a declaratory judgment that the defendant's application for a building permit did not qualify for an exemption from zoning regulations based on the pleadings in the record. 55 Haw. at 44, 514 P.2d at 864.

837 P.2d 1247, 1257–58 (1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993); *Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 283–85, 768 P.2d 1293, 1299–1300 (1989) (observing that the claimant "cite[d] no authority from any legislative body giving [it] the right to seek judicial review" as a private attorney general) [9]; *Akau v. Olohana Corp.*, 65 Haw. 383, 386–90, 652 P.2d 1130, 1133–35 (1982); *Life of the Land*, 63 Haw. at 176, 623 P.2d at 439; *Waikiki Discount Bazaar, Inc. v. City and County of Honolulu*, 5 Haw.App. 635, 640–43, 706 P.2d 1315, 1319–21 (1985). Although the injury in fact test does not apply to actions brought under HRS § 92–12,[10] and additional requirements must be met under

HRS § 91–14,[11] this standard rule governing standing to sue applies to actions brought under HRS § 91–7. *Bush*, at 479, 918 P.2d at 1135. In other words, listed in order from the broadest to the narrowest category, the respective classes of potential litigants under HRS chapters 91 and 92 are as follows: "any person," HRS § 92–12; "any interested person," HRS § 91–7;[12] and "persons aggrieved . . . in a contested case." HRS § 91–14.

Applying the injury in fact test to the instant case, we observe that: (1) Jackson alleges that she has been injured by State Farm's denial of appropriate, reasonable, and necessary medical treatment; (2) that injury is fairly traceable to the DCCA's adoption of HAR § 16–23–93, which "appl[ies] to treat-

---

9. We discussed the term "private attorney general" in *Kaapu v. Aloha Tower Dev. Corp.*, 74 Haw. 365, 846 P.2d 882 (1993). *See id.* at 383, 846 P.2d at 889–90 (construing the standing requirements under HRS § 92–12 (1993)). HRS § 92–12 provides:

**Enforcement.** (a) The attorney general and the prosecuting attorney shall enforce this part.

(b) The circuit courts of the State shall have jurisdiction to enforce the provisions of this part by injunction or other appropriate remedy.

(c) Any person may commence a suit in the circuit court of the circuit in which a prohibited act occurs for the purpose of requiring compliance with or preventing violations of this part or to determine the applicability of this part to discussions or decisions of the public body. The court may order payment of reasonable attorney fees and costs to the prevailing party in a suit brought under this section.

(d) The proceedings for review shall not stay the enforcement of any agency decision; but the reviewing court may order a stay if the following criteria have been met:

(1) There is likelihood that the party bringing the action will prevail on the merits;

(2) Irreparable damage will result if a stay is not ordered;

(3) No irreparable damage to the public will result if a stay is not ordered;

(4) Public interest will be served by the stay order.

After disposing of Kaapu's claims under HRS chapters 92 and 92F on the merits, we held that Kaapu did not have standing to sue the Aloha Tower Development Corporation (ATDC) under HRS chapter 206J (Supp.1992) because he suffered no injury in fact. 74 Haw. at 393, 846 P.2d at 893–94. Specifically, we observed that, even assuming that there was a genuine issue of material fact as to whether the ATDC's nondisclosure of rival development proposals impaired his eco-

nomic interests as an affiliate of one of the competing developers, Kaapu failed to meet the second and third elements of the injury in fact test. *Id.* at 392, 846 P.2d at 893. We applied the standard injury in fact test because "HRS chapter 206J is devoid of the kind of 'private attorney general' provision that is contained in HRS § 92–12." *Id.* at 390, 846 P.2d at 893.

10. All that is required is an allegation that " 'a prohibited act' has occurred in violation of HRS §§ 92–1 through 92–13[.]" *Kaapu*, 74 Haw. at 381, 846 P.2d at 889.

11. Claimants must also demonstrate that they participated or were otherwise "involved" in a contested case and that they complied with the agency's rules. *Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n [PASH]*, 79 Hawai'i 425, 431–34, 903 P.2d 1246, 1252–55 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996); *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 67–71, 881 P.2d 1210, 1213–17 (1994).

12. *Compare* HRS § 91–7 *with* HRS § 632–1 (1993). Although HRS § 632–1 provides for standing to sue "[i]n cases of actual controversy," HRS § 632–6 clarifies that

[the] purpose [of HRS chapter 632] is to afford relief . . . without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor. It is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people.

*See also Life of the Land*, 63 Haw. at 172, 623 P.2d at 438 ("While standing requisites ordinarily comprise one of the 'prudential rules' discussed earlier, they may also be tempered, or even prescribed, by legislative and constitutional declarations of policy.").

ment occurring after May 31, 1993, regardless of when the accident causing the injury occurred" notwithstanding the legislature's express statement of its intent not to "affect rights, duties, or actions that are based upon events or acts which have taken place prior to [January 1, 1993]"; and (3) a decision precluding use of peer review procedures with respect to treatment requests for motor vehicle accidents that occurred prior to January 1, 1993 would likely provide relief for Jackson's alleged injury. Accordingly, Jackson has "alleged such a personal stake in the outcome of the controversy as to warrant [her] invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on [her] behalf." *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438 (internal quotations marks, brackets, and ellipsis omitted).[13]

Thus, we hold that the circuit court erred in concluding that Jackson did not have standing to bring her claim under HRS § 91–7.

### B. *Statutory Interpretation*

■ We now turn to the merits of Jackson's complaint—i.e., we must determine whether the peer review procedures established pursuant to the 1992 amendments apply to a no-fault claimant who was injured in a motor vehicle accident prior to the effective date of the amendments. Whether the injury occurred before or after the effective date, the law provides that a no-fault claimant is entitled to "appropriate and reasonable expenses necessarily incurred[.]" HRS § 431:10C–103(10)(A) (Supp.1989). In either event, the insurer has thirty days to pay a claim, deny it, or request additional information when it receives a health care provider's bill for treatments rendered. *Compare* HRS §§ 431:10C–304(2) and (3) (1993), *with* HRS §§ 431:10C–304(2) and (3) (1987 Spec. Pamphl.).[14] No-fault claimants also retain their rights to (1) arbitration of any dispute and (2) an administrative hearing under HRS chapter 91 within sixty days of an insurer's denial of no-fault benefits. *Compare* HRS §§ 431:10C–212 and –213 (1993),[15] *with* HRS §§ 431:10C–212 and –213 (1987 Spec. Pamphl.). *See also* HRS § 431:10C–308.6(f) (1993) ("Any insured or provider may, in addition to or in lieu of reconsideration, seek an administrative hearing, arbitration, or court review of a denial of no-fault benefits based, in whole or in part, upon a peer review organization determination."). Both arbitration proceedings and administrative hearings remain subject to judicial review. HRS §§ 431:10C–212 and –213.

The new peer review provisions apply to charges and treatment in excess of the workers' compensation fee schedules and guidelines for frequency of treatment and rehabilitative services. HRS § 431:10C–308.6(a). Health care providers may request prior approval for treatment plans that exceed the fee schedules and treatment guidelines, and such requests will be deemed approved unless the insurer challenges the request in writing, whereupon the request will be submitted for peer review. HRS §§ 431:10C–308.6(a) and (d). If the health care provider bills the insurer for treatment and/or rehabil-

---

**13.** The DCCA's implicit concern regarding "the danger of a multiplicity of suits ... [and the need to] prevent inconsistent judgments[,]" *see Akau*, 65 Haw. at 388–89, 652 P.2d at 1134, is misplaced in the instant case because the underlying issue is one of statutory interpretation. The resolution of this genuine dispute between the parties will be applicable to all other requests for treatment concerning motor vehicle accidents that occurred prior to January 1, 1993. Finally, the DCCA's argument that the insurers and health care providers are the only ones who are impacted by the statutes and rules is without merit.

**14.** Pursuant to the 1992 amendments, the only relevant, substantive differences are that: 1) the insurer's authority to deny benefits is now subject to new provisions governing peer review, *see*

HRS § 431:10C–304(3)(B) (1993); and 2) the health care provider may not bill an insured claimant directly for services provided. HRS § 431:10C–308.5 (1993).

**15.** The 1992 amendments extended the right to arbitration and/or an administrative hearing to the provider as well as the claimant. HRS §§ 431:10C–212(a) and –213(a). In addition, the commissioner's jurisdiction over administrative hearings is no longer limited by the amount in dispute. *Compare* HRS § 431:10C–212(b) (1993), *with* HRS §§ 431:10C–212(b)(1) and (2) (1987 Spec. Pamphl.) (limiting claims over $5,000 unless the excess amount results solely from the failure to comply with section 431:10C–304).

itative services without having sought prior approval, the insurer must submit any challenge for peer review within ten days of receiving the bill. HRS § 431:10C–308.6(c) (excepting challenges for continuing treatment or services, which may be made at any time).[16]

Excess charges that are determined by a peer review organization not to be appropriate or reasonable may not be collected by the provider and will be reported to the regulated industries complaints office of the DCCA. HRS § 431:10C–308.6(j). However, the insurer must compensate health care providers for the preparation of reports documenting the need for treatments in excess of the schedules regardless of the peer review outcome, see HRS § 431:10C–308.6(e), must pay a $200.00 filing fee for peer review challenges, see HAR §§ 16–23–90 and 16–23–118(b), and must also pay one and one-half per cent interest per month on any amount withheld from the provider if the peer review organization determines that the treatment or rehabilitative services were appropriate and reasonable. HRS § 431:10C–308.6(h). Either the insurer, provider, or insured may request reconsideration of decisions by peer review organizations within thirty days. HRS § 431:10C–308.6(f). See also HAR § 16–23–119(c) (requiring any party seeking reconsideration to pay a $100 filing fee plus the cost of reconsideration). As discussed earlier, the claimant, insurer, or provider may seek arbitration of any no-fault dispute and the claimant or provider may obtain an administrative hearing subject to judicial review if dissatisfied by the final decision of a peer review organization.

In summary, the peer review process establishes a check on abuses of the no-fault insurance system and is designed to help contain costs. It is clearly within the legislature's power to modify existing law by enacting such measures. Nevertheless, it is also well-settled that "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." HRS § 1–3 (1993).

See, e.g., State v. Bolosan, 78 Hawai'i 86, 91, 890 P.2d 673, 678 (1995); Ross v. Stouffer Hotel Co., 76 Hawai'i 454, 463, 879 P.2d 1037, 1046 (1994); State v. Nakata, 76 Hawai'i 360, 377, 878 P.2d 699, 716, reconsideration denied, 76 Hawai'i 453, 879 P.2d 558 (1994), cert. denied, —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); State v. Von Geldern, 64 Haw. 210, 214, 638 P.2d 319, 322 (1981); Clark v. Cassidy, 64 Haw. 74, 77, 636 P.2d 1344, 1346 (1981).

The Appellees argue that HRS § 1–3 does not apply in this case because the changes in the law discussed above did not affect the substantive rights of claimants who were injured prior to the effective dates of these provisions. Rather, the Appellees contend that these laws represent "mere remedial or procedural change[s]" prescribing methods that give effect to existing rights. See Cassidy, 64 Haw. at 77 & n. 8, 636 P.2d at 1347 n. 8. Accordingly, the Appellees urge us to follow the Pennsylvania Superior Court's observation, in Frey v. State Farm Mut. Auto. Ins. Co., 429 Pa.Super. 425, 632 A.2d 930 (1993), that "[p]eer [r]eview does not change substantive rights, but merely changes the procedures for challenging medical treatment and expenses." Id. 632 A.2d at 933.

The Appellees' reliance on Frey is inapposite for two reasons. First, Pennsylvania's analogous statutory provision (see 75 Pa. C.S.A. § 1797) specifically provides that its peer review procedure:

> applies to payments by property and casualty insurers for medical treatment or services rendered on or after April 15, 1990, for the treatment of care of persons covered by automobile insurance, regardless of when the accident or incident resulting in the need for medical care occurred or when the first claim was filed.

632 A.2d at 932 (citing 31 Pa.Code Ch. 68, § 1(a)) (emphasis in original). Second, the peer review requirement established under HRS § 431:10C–308.6 does not simply effect remedial or procedural changes in the law.

---

**16.** Presumably, the reference in HRS § 431:10C–308.6(g) to a "thirty day" period—during which an insurer may challenge a provider's request for treatment or services and not be obligated to pay the disputed amounts until the peer review organization makes its decision—applies to "continuing services and treatment" under HRS § 431:10C–308.6(c). Otherwise, it is unclear how the ten and thirty day provisions could be reconciled.

Application of the 1992 no-fault amendments to claimants who continue to suffer from injuries sustained prior to the effective date of the law, affects their right to prompt treatment of their injuries as provided by law and suggested by their no-fault contracts.

We are not persuaded by the Appellees' argument that the "broad legislative purpose . . . [of] cost-containment" reflected in the no-fault amendments somehow eviscerates the plain meaning of Act 123, § 7 and Act 124, § 15.[17] The Hawai'i legislature clearly stated that:

> [t]he provisions of this Act *do not affect rights, duties, or actions that are based upon events or acts which have taken place prior to the effective date of this Act,* or the effective date of any provision of this Act, nor to penalties that were incurred or proceedings begun before the effective date of this Act.

1992 Haw. Sess. L. Act 123, § 7 at 209–10 (emphasis added); 1992 Haw. Sess. L. Act 124, § 15 at 218 (emphasis added). Thus, to the extent that HAR § 16–23–93 requires application of peer review procedures with respect to the treatment of injuries sustained prior to the effective date of the 1992 no-fault amendments, we hold that the rule is invalid because it exceeds the DCCA's statutory authority.

### IV. CONCLUSION

For the foregoing reasons, we reverse the circuit court's order granting summary judgment to the Appellees and remand with instructions to enter summary judgment in favor of Jackson.

---

**17.** We are aware that the legislature "emphasiz[ed] that meaningful reform of the no-fault law to stabilize the cost of insurance can only be achieved if all parties in the no-fault insurance system work together and are willing to *make concessions* in the interest of developing a system that is effective and fair." Sen. Conf. Comm. Rep. No. 161, in 1992 Senate Journal, at 826 (emphasis added). However, there is no indication of any intent to retroactively apply the peer review procedures to accidents that occurred prior to the effective date of the 1992 no-fault amendments. The legislature easily could have accomplished this goal if it so desired. *See, e.g.,* 31 Pa.Code Ch. 68, § 1(a), *cited in Frey,* 632 A.2d at 932. Notwithstanding the DCCA's suggestion that a "two-track system of no-fault administration" would be "preposterous," we believe the legislature rationally could have decided that such a system fairly accommodates the vested contractual rights of claimants who continue to suffer from injuries sustained prior to the effective date of the 1992 amendments.