918 P.2d 1130

Leiff Koa BUSH, Martin D.L. Kahae, Co-
lette Y. Machado and Kelson "Mac"
Poepoe, Plaintiffs–Appellants,

v.

Kali WATSON, in his official capacity as
Chairperson of the Hawaiian Homes
Commission; Andrew Apana, Nani
Brandt, Dennis Kauahi, Robert McFar-
land, Ann Nathaniel, Alvina Park,
George Robertson, and Patrick Shee-
han, in their official capacities as mem-
bers of the Hawaiian Homes Commis-
sion; Department of Hawaiian Home
Lands; Hawaiian Homes Commission;
Louella O.W. Albino, Alexander R.K.
Bishaw, Lorraine K. Borden, James A.
Boswell, Miriam K. Briones, Louis Hao,
Jr., Nancy Kahinu, Evelyn K. Kanawali-
wali, Emily W. Aki Swaba, George R.P.
Kahinu, Jr., Jon K. Naeole, Dayna L.
Naeole, Georgina K.K. Naeole, Wey-
mouth Kamakana, John E. Kelly, Lottie
Burrows, Arthur K. Kaai, Daniel Keka-
huna, Alice K. Demello, Sue Ann M.M.
Hasegawa, Priscilla Holokai, Wayne
Naeole and Williamette P. Neuhart;
Larry Jefts, William F. Pfeil, Hawaiian
Research, Ltd., Grant Schule, Seizen J.
Bonk, Nafetalai Oto, Frances I. Kaleli-
kane, Herman K. Puaa, Lorraine M.
Vincent, Lillian K. Akina, Ronald K.
Akina, Henrietta M. Davis, Matthew K.
Adolpho, Jr., and Julia Keliikuli–Peters,
Defendants–Appellees,

Mary K. Mamuad, John K. Kapu, III, Tomi
Lou Mamuad, or their Successors and
Assigns; John Does 1 through 100, Doe
Corporations 1 through 100 and Doe
Governmental Agencies 1 through 100,
Defendants.

No. 19154.

Supreme Court of Hawai'i.

May 24, 1996.

Reconsideration Denied July 8, 1996.

476

Carl C. Christensen and Paul F.N. Lucas (Alan T. Murakami and Arnold L. Lum with them on the briefs of the Native Hawaiian Legal Corporation), Honolulu, for plaintiffs-appellants.

Steven S. Michaels (Girard D. Lau, with him on the brief), Deputy Attorneys General, Honolulu, for State-appellees.

Ward F.N. Fujimoto of Fujiyama, Duffy & Fujiyama, Honolulu, for lessee defendants-appellees.

Thomas E. Cook of Lyons, Brandt, Cook & Hiramatsu, Honolulu, for contracting defendants-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

■ Plaintiffs–Appellants Leiff Koa Bush, Martin D.L. Kahae, Colette Y. Machado, and Kelson "Mac" Poepoe (Appellants) appeal the second circuit court's order granting summary judgment in favor of the Defendants–Appellees and amended judgment dismissing the Appellants' claims with prejudice. The Appellants' complaint sought (1) a declaration that certain third party agreements (TPAs)[1] are contrary to the Hawaiian

---

1.  A TPA is an agreement whereby the lessee of an agricultural homestead allows a stranger to the lease to use his or her land for farming or pastoral purposes. As interpreted by the Hawaiian Homes Commission (HHC), these TPAs are permissible, under the Department of Hawaiian Home Lands administrative rules, where formal-ly approved by the HHC. Hawai'i Administrative Rules (HAR) § 10-3-35 (1981) ("No lessee may, without written approval from the commission, enter into any contract, joint venture, agreement or other arrangement of any sort with a third person on lands covered by lessee's lease

Homes Commission Act (HHCA)[2] and (2) an injunction barring homestead lessees from entering into such agreements with non-Hawaiians.

## I. BACKGROUND

Appellants Bush, Kahae, Poepoe, and Machado are native Hawaiian beneficiaries of the HHCA living on the island of Moloka'i. Bush, Kahae, and Poepoe live on, cultivate crops on, and/or raise livestock on homestead lots in Ho'olehua, Moloka'i under the HHCA.[3] Machado resides in Puko'o, Moloka'i; she is on the Department of Hawaiian Home Lands' (DHHL) Moloka'i waiting list and seeks to obtain a residential and agricultural homestead lot at Ho'olehua.

From 1980 to 1992, Larry Jefts and other non-Hawaiian farmers entered into TPAs with a number of native Hawaiian lessees on Moloka'i whereby the non-Hawaiian third parties contracted to use the lessees' crop acres for farming or pastoral purposes. The native Hawaiian lessees in turn received compensation in the form of monthly payments ranging from $120.00 to $200.00. Jefts and other third party non-Hawaiian farmers thereby contracted for the use of a number of leaseholds, accumulating consider-able acreage upon which to facilitate large scale agribusiness. By the time Appellants petitioned to the Hawaiian Homes Commission (HHC) to protest these agreements, Jefts had amassed close to 495 acres, which included approximately thirteen different leaseholds.

On May 19, 1992, the HHC approved various TPAs. Although the Appellants were not present during these proceedings,[4] they did participate in a June 30, 1992 proceeding during which the HHC voted to reaffirm the legality of the TPAs and deny Bush and Kahae's requests for a contested case hearing. In a previous case, we held that the courts lacked subject matter jurisdiction under Hawai'i Revised Statutes (HRS) § 91–14(a) (1993) to review Bush and Kahae's claims. *Bush v. Hawaiian Homes Comm'n* [*Bush I* ], 76 Hawai'i 128, 136–37, 870 P.2d 1272, 1281 (1994). However, we observed that the "Appellants are not barred from contesting the Commission's actions through alternative means[.]" *Id.* at 137, 870 P.2d at 1281.

On May 4, 1994, the Appellants filed the present action under 42 U.S.C. § 1983 (1988),[5] challenging the legality of the twen-

for the cultivation of crops or the raising of livestock.").

2. *See* HHCA, 1920, Act of July 9, 1921, c. 42, 42 Stat. 108 (codified as amended at 48 U.S.C. note prec. § 491 (1933) and Haw. Const. art. XII, § 1), *reprinted in* 1 Haw.Rev.Stat. 191 (1993) (hereafter the HHCA will be cited as reprinted in Haw.Rev.Stat.).

3. The [HHCA], Pub.L. No. 67–34, 42 Stat. 108 (1921) . . ., designated approximately 200,000 acres as "Hawaiian homes lands" and created the Hawaiian Homes Commission to manage them. The Commission was authorized to lease small parcels to native Hawaiians for 99 years at nominal rates for agricultural and [pastoral] homestead use. Section 4 of the [Hawai'i] Admission Act, Pub.L. No. 86–3, 73 Stat. 4 (1959) ("Admission Act"), provided, "as a compact with the United States," that the [HHCA] would be "adopted as a provision of the Constitution of [Hawai'i], . . . subject to amendment or repeal only with the consent of the United States." Section 5(b) of the Admission Act transferred title to the home lands [as well as the ceded lands] to the State of Hawai'i. Section 5(f) provided that these lands would "be held by said State as a public trust" for specified purposes, and "their use for any other object shall constitute a breach of trust for which suit may be brought by the United States."

*Han v. United States Dept. of Justice,* 45 F.3d 333, 335 (9th Cir.1995). *See also Pele Defense Fund v. Paty,* 73 Haw. 578, 585–86, 837 P.2d 1247, 1253–54 (1992), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993) (providing a brief description of the "ceded lands" and listing the five purposes identified in section 5(f) of the Admission Act); *Trustees of the Office of Hawaiian Affairs v. Yamasaki,* 69 Haw. 154, 159–64, 737 P.2d 446, 449–52, *cert. denied,* 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987) (describing the evolution of the "ceded lands" in greater detail).

4. Kahae and his family appeared before the HHC on December 18, 1987 to challenge the validity of the TPAs. On April 28, 1992, the HHC deferred action on twenty-one written requests by homestead lessees for approval of their TPAs. The HHC denied the Appellants' request to postpone consideration of the TPAs further despite the fact that the Appellants' attorney could not attend the May 19, 1992 meeting held on Kaua'i.

5. Section 1983 provides in pertinent part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any

ty-one TPAs approved by the Commission in 1992 and other "de facto" TPAs that had not yet been submitted to the Commission for approval. The complaint named the chairperson and commissioners of the HHC, the HHC and the DHHL (collectively "State Appellees"), thirty native Hawaiian lessees of homestead lots (Lessee–Appellees), and six persons who entered into TPAs granting them use of agricultural homestead lots (Third–Party–Appellees).

The circuit court dismissed the Appellants' claims against the State Appellees on the basis of sovereign immunity and parallel federal litigation raising identical challenges to the TPAs. *See Han v. Dep't of Justice*, 824 F.Supp. 1480, 1489 (D.Haw.1993), *aff'd*, 45 F.3d 333 (9th Cir.1995). The court also granted the State Appellees' motion for summary judgment and the Lessee–Appellees and Third–Party–Appellees' joinders therein. After we issued a June 13, 1995 order dismissing the Appellants appeal as premature, *see Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 869 P.2d 1334 (1994), the circuit court entered an ex parte order amending its judgment and dismissing "with prejudice" all of the claims against all of the defendants.

## II. *STANDARD OF REVIEW*

"We review the circuit court's award of summary judgment de novo under the same standard applied by the circuit court." *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995). Summary judgment is appropriate if the pleadings, depositions, answers to interroga-

tories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo*. In addition, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.

*State v. Baron*, 80 Hawai'i 107, 113, 905 P.2d 613, 619, *reconsideration granted in part and denied in part*, 80 Hawai'i 187, 907 P.2d 773 (1995) (citation and brackets omitted).

## III. *DISCUSSION*

The Appellants assert that their claims are not barred under the doctrine of sovereign immunity and that the HHC violated its trust duties by failing to represent the interests of those Hawaiians who want to become economically self-sufficient on homestead land. The Appellees counter that: 1) the Appellants' claims were properly dismissed on sovereign immunity and justiciability grounds; 2) the Appellants did not have standing; and 3) the TPAs do not violate the HHCA or the State's implied trust duties under the HHCA.[6]

---

State ... subjects, or cases to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

6. For convenience, this opinion treats the Appellees collectively, except where otherwise indicated. The Third–Party–Appellees concur with the State Appellees' arguments; the Lessee–Appellees add that (1) the Appellants' claims are barred by the doctrine of unclean hands, and (2) the circuit court did not abuse its discretion in awarding costs for computer assisted legal research (CALR) charges. The Lessee–Appellees'

argument based upon the willingness of at least some of the Appellants to enter into similar TPAs with a native Hawaiian organization is without merit under the express language of the HHCA. *Cf. Naliielua v. Hawai'i*, 795 F.Supp. 1009 (D.Haw.1990), *aff'd*, 940 F.2d 1535 (9th Cir. 1991). Based on our holding in this case, we need not reach the second argument. Nevertheless, because the issue of costs may arise in subsequent proceedings, we observe that the Intermediate Court of Appeals recently rejected CALR as a component of costs. *Bjornen v. State Farm Fire and Casualty Co.*, 81 Hawai'i 105, 107–09, 912 P.2d 602, 604–06 (App.1996). *See also Bergmann v. Boyce*, 109 Nev. 670, 856 P.2d 560, 566–67 (1993).

A. *Jurisdictional Challenges*

### 1. *Standing*

Relying upon *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Appellees argue that the Appellants do not have standing because they failed to show how a favorable ruling would redress their harm and neglected to submit proof tracing any losses to the specific actions of third parties. This argument is without merit.

We did not expressly decide the question of standing in *Bush I*.[7] Nevertheless, in *Han v. Dept. of Justice*, 824 F.Supp. 1480 (D.Haw.1993), *aff'd*, 45 F.3d 333 (9th Cir. 1995), the United States District Court for the District of Hawai'i found that plaintiffs who brought a substantially similar claim had standing to challenge these TPAs. 824 F.Supp. at 1487. Moreover, we have consistently held that standing barriers should be lowered in cases of public interest under our jurisdiction. *See, e.g., Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Hawai'i 192, 204–05, 891 P.2d 279, 291–92 ("federal justiciability standards are inapplicable in state court declaratory judgment actions involving matters of great public importance"), *cert. denied*, —— U.S. ——, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995); *Pele Defense Fund v. Paty*, 73 Haw. 578, 592, 837 P.2d 1247, 1257 (1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993); *Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 176, 623 P.2d 431, 439 (1981) (the "touchstone" of our standing requirements is the "needs of justice"). *See also Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n*, 79 Hawai'i 425, 434 n. 15, 903 P.2d 1246, 1255 n. 13 (1995) (recognizing, with respect to native Hawaiian issues, "the need to avoid foreclosing challenges to administrative determinations through restrictive applications of standing requirements") (internal quotations, brackets, and citations

omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996).

■ As a general rule, whether a party has standing is measured by the three part "injury in fact" test: (1) he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable decision would likely provide relief for a plaintiff's injury. *Pele*, 73 Haw. at 594, 837 P.2d at 1258 (holding that the plaintiffs had standing to bring a declaratory judgment action asserting, inter alia, that the State breached its trust duties under section 5(f) of the Admission Act); *see also Kaapu v. Aloha Tower Dev. Corp.*, 74 Haw. 365, 391, 846 P.2d 882, 893 (1993) (applying the "standard rules governing standing to sue" in the absence of applicable statutory language establishing the right to sue as a "private attorney general"). The Appellants have adequately established grounds for standing: (1) the HHC's approval of the TPAs has injured trust beneficiaries by allowing non-Hawaiian third parties to acquire large parcels of homestead lots and unduly burden the Appellants' commercial farming interests; (2) these injuries are traceable to the HHC's approval of the TPAs; and (3) invalidation of the TPAs would allow the Appellants to pursue commercially viable farming efforts.

Thus, we hold that the Appellants have standing in the instant case to challenge the HHC's decision to approve the TPAs between the Lessees–Appellees and the Third–Party–Appellees.

### 2. *Claim Preclusion/Res Judicata*

■ The Appellees next contend that the Appellants' claims are precluded by the litigation in *Han, supra*. We have consistently recognized that:

> The judgment of a court of competent jurisdiction is a bar to a new action in any court between the same parties or

---

**7.** In *Bush I*, we made the suggestion that [the] Appellants may well have been aggrieved by the [HHC's] decision to approve the TPAs, inasmuch as the approved TPAs may have enabled the formation of agribusinesses which in turn unduly burdened Appellants' farming

practice. Thus, Appellants could claim they were "specially, personally and adversely affected" by the administrative decision. 76 Hawai'i at 134, 870 P.2d at 1278 (citations omitted).

their privies concerning the same subject matter, and precludes the relitigation, not only of the issues which were actually litigated in the first action, but also all grounds of claim and defense which might have been properly litigated in the first action but were not litigated or decided.

*Morneau v. Stark Enters., Ltd.*, 56 Haw. 420, 422–23, 539 P.2d 472, 474–75 (1975) (quoting *Ellis v. Crockett*, 51 Haw. 45, 55, 451 P.2d 814, 822 (1969) (quoting *In re Bishop Estate*, 36 Haw. 403, 416 (1943))).

In *Morneau*, we also commented on the implications of the doctrine of collateral estoppel:

Collateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies.... Collateral estoppel also precludes relitigation of facts or issues previously determined by one not a party in a prior suit against one who was a party in that suit and who himself raised and litigated the fact or issue.

56 Haw. at 423, 539 P.2d at 475 (citations omitted). These principles are tempered only by the prerequisite that a plaintiff have a full and fair opportunity to litigate the relevant issues. *See Morneau*, 56 Haw. at 421–22, 539 P.2d at 474; *see also Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (noting a long recognized exception that "collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the issue in the earlier case").

*Pele*, 73 Haw. at 599–600, 837 P.2d at 1261 (some citations omitted).

■ In *Morneau*, this court established a three-pronged test to determine whether res judicata (or collateral estoppel as an included doctrine) bars relitigation of an issue. Res judicata will bar relitigation where: 1) "the issue decided in the prior adjudication [is] identical with the one presented in the action in question"; 2) "there [was] a final judgment on the merits"; and 3) "the party

against whom [res judicata] is asserted [was] a party or in privity with a party to the prior adjudication[.]" *Morneau*, 56 Haw. at 424, 539 P.2d at 475. Although *Han* involved the same subject matter, i.e., the validity of the TPAs between the Lessee–Appellees and the Third–Party–Appellees, the *Morneau* test has not been met in the instant case.

First, the Appellants' allegation that the TPAs violate the HHCA were not addressed in *Han*. 45 F.3d at 339 ("claims under the [HHCA] ... arise exclusively under state law" and, thus, do not give rise to federal court jurisdiction). Second, *Han* did not reach the merits of the dispute. The state law claims were dismissed for lack of subject matter jurisdiction, which is not an adjudication on the merits. *See* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4436, at 339 (1981) ("Unless the court in its order for dismissal otherwise specifies, the dismissal under this subdivision and any dismissal not provided for under this rule *other than dismissal for lack of jurisdiction* or for improper venue or for failure to join a party operates as an adjudication on the merits.") (emphasis added). Third, the instant case does not involve the same parties or privies as *Han*.

■ The Appellees argue, nevertheless, that *Han* should be given preclusive effect because Bush and Kahae participated as amici in the appeal to the United States Court of Appeals for the Ninth Circuit in *Han*.

As the preclusive effects of judgments have expanded to include nonparties in more and more situations, however, it has come to be recognized that the privity label simply expresses a conclusion that preclusion is proper. As to privity, current decisions look directly to the reasons for holding a person bound by a judgment.

Wright, Miller & Cooper, *supra* § 4449, at 418–19 and Supp. (1995) at 331. For example, preclusion is fair in circumstances where the nonparty and party had the same practical opportunity to control the course of the proceedings. *Id.* § 4451, at 429–30. Absent a showing that the Appellants controlled the *Han* litigation, the mere fact that Bush and

Kahae filed an amicus brief in that case is insufficient to give *Han* preclusive effect. *See Munoz v. County of Imperial*, 667 F.2d 811, 816 (9th Cir.), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 62 (1982).

■ Preclusion may also be appropriate where the party in the previous action was acting in a representative capacity for the current party. *See Kauhane v. Acutron*, 71 Haw. 458, 464, 795 P.2d 276, 279 (1990). However, "[s]everal important rules limit the extent of preclusion by representation. The most obvious [rule is] that the representative must have been appointed by a valid procedure." Wright, Miller & Cooper, *supra* § 4454, at 463. There is no evidence in the record that any of the plaintiffs in *Han* was acting as a representative of any of the Appellants in the instant case, much less was appointed as a representative by a valid procedure.

For the foregoing reasons, we hold that *Han* should not be given preclusive effect in the instant case.

### 3. *Sovereign immunity*

One of the focal points of this appeal is whether the Appellants' claims are barred by sovereign immunity. In *Pele*, we observed that federal immunity principles under the eleventh amendment to the United States Constitution are "relevant to our own principles of sovereign immunity." 73 Haw. at 606, 837 P.2d at 1264. In previous cases, we have held that "the sovereign State is immune from suit for money damages, except where there has been a 'clear relinquishment' of immunity and the State has consented to be sued." *Id.* at 607, 837 P.2d at 1265 (citing *Washington v. Fireman's Fund Ins. Co.*, 68 Haw. 192, 198, 708 P.2d 129, 134 (1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 977 (1986)). This exception to sovereign immunity can be traced to *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Accordingly, we have adopted the rule in *Young*, which:

makes an important distinction between prospective and retrospective relief. If the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity. This is true "even though accompanied by a substantial ancillary effect on the state treasury." However, relief that is "tantamount to an award of damages for a past violation of ... law, even though styled as something else," is barred by sovereign immunity.

*Pele*, 73 Haw. at 609–10, 837 P.2d at 1266 (footnotes and citations omitted).

■ "Simply asking for injunctive relief and not damages *does not* clear the path for suit. The [United States] Supreme Court has recognized that the difference between retrospective and prospective relief 'will not in many instances be that between day and night.'" *Id.* at 610, 837 P.2d at 1266 (emphasis in original) (quoting *Ulaleo v. Paty*, 902 F.2d 1395, 1399 (9th Cir.1990)). In *Pele*, an organization comprised of native Hawaiian beneficiaries of the ceded lands trust,[8] among others, sought to nullify a land exchange agreement between the State and a private estate via imposition of a constructive trust. We held that this request was, "in effect, a request for compensation for the past actions of [state officials]" because it was

"essentially equivalent" to a nullification of the exchange and the return of the exchanged lands to the trust res. The effect on the state treasury would be direct and unavoidable, rather than ancillary, because imposing a constructive trust on lands now held by [the purchaser] would require that the State compensate [the purchaser] for its property.

*Id.* at 611, 837 P.2d at 1267.

■ Unlike *Pele*, there is no direct and unavoidable effect on the state treasury in the instant case. The Appellants alleged prospective (i.e., continuing and ongoing) violations of HHCA § 208 with regard to existing TPAs as well as those that have not yet

8. *See* Hawai'i Admission Act § 5(f), Pub.L. No. 86–3, 73 Stat. 4, 6 (1959) (providing that lands granted to the State under section 5(b) of the Admission Act "shall be held by said State as a public trust"); Hawai'i Constitution, art. XII, § 4 (1978) (providing that these lands "shall be held by the State as a public trust for native Hawaiians and the general public").

been approved by the HHC.[9] They sought declaratory and injunctive relief that would void existing TPAs and *de facto* TPAs and enjoin the HHC from approving future TPAs. As distinguished from the substance of the claim for relief in *Pele*, an injunction voiding the TPAs would not render the State Appellees liable to the contracting parties because each TPA contains an indemnity provision explicitly protecting the DHHL from any liability:

> Third Party and Lessee shall indemnify and defend Department, its Officers, agents and employees from and against all losses, damages, costs, expenses, attorney's fee and other sums which Department may incur, pay or be obligated to pay on account of any demand, claim or suit for any loss of damage to property, property right or injury or death to any person, arising out of, caused by or in any way connected with the implementation, use, or reliance upon this Third Party Agreement.

In other words, the Appellants' requested relief is not "a request for compensation for the past action" of the HHC's members. *Pele*, 73 Haw. at 611, 837 P.2d at 1267.

Thus, we hold that sovereign immunity does not bar the Appellants claims in the instant case.[10]

## B. *Violations of the HHCA*

The Appellants allege that the TPAs violate HHCA § 208(5) because that section (1) prohibits lessees from transferring or holding their leasehold for the benefit of anyone except a native Hawaiian and (2) prohibits lessees from subleasing their parcels:

> The lessee shall not in any manner transfer to, or otherwise hold for the benefit of, any other person or group of persons or organizations of any kind, except a native Hawaiian or Hawaiians, and then only upon the approval of the department, or agree so to transfer, or otherwise hold, the person's interest in the tract. Such interest shall not, except in pursuance of such a transfer to or holding for or agreement with a native Hawaiian or Hawaiians approved by the department, or for any indebtedness due the department or for taxes, or for any other indebtedness the payment of which has been assured by the department, including loans from other agencies where such loans have been approved by the department, be subject to attachment, levy, or sale upon court process. *The lessee shall not sublet the person's interest in the tract or improvements thereon.*

1 Haw.Rev.Stat. 191, 210 (1993) (HHCA, 1920, § 208(5)) (emphases added).

The Appellees contend that the TPAs are "mere licenses," [11] which do not create prop-

---

9. We decline to adopt the federal courts' narrow view that a claim for relief based on past illegal action is necessarily "retrospective." *See Han*, 824 F.Supp. at 1489, *aff'd*, 43 F.3d at 338. As suggested by counsel for the Appellants during oral argument, such an interpretation would force potential claimants to discern the potential impact of proposed agency action, ascertain the threat of injury, and acquire an attorney to draft a complaint and file suit (subject to sanctions under Hawai'i Rules of Civil Procedure (HRCP) Rule 11), all within the six days required for notice of administrative proceedings under HRS § 92–7(b) (1993). Rather than imposing such an onerous burden on potential claimants, the crucial inquiry under our sovereign immunity principles is whether the relief sought for a past violation of law is "tantamount to an award of damages" or would merely have an "ancillary" effect on the state treasury. *Pele*, 73 Haw. at 609–10, 837 P.2d at 1266 (citing *Papasan v. Allain*, 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1985)).

10. As a result of this holding, we need not decide whether the State expressly waived immunity from suits arising out of alleged violations of the HHCA in HRS chapter 661 or 673.

11. A license in real property is defined as a personal, revocable, and unassignable privilege, conferred either by writing or parole, to do one or more acts on land without possessing any interest therein.... [A] license is distinguishable from a lease in that a lease conveys an interest in land and transfers possession[.]
25 Am.Jur.2d *Easements and Licenses* § 125 at 527–28 (1966). *See also Black's Law Dictionary* 919–20 (6th ed. 1990) (A "license" is a "personal privilege to do some particular act or series of acts on land without possessing any estate or interest therein, and is ordinarily revocable at the will of the licensor and is not assignable."). By contrast, *Black's Law Dictionary* defines a "sublease" as

> [a] lease executed by the lessee of land or premises to a third person, conveying the same interest which the lessee enjoys, but for a

erty interests in the land.[12] In support of their argument, the Appellees cite: 1) the absence of a definite term in the TPAs; 2) the fact that the TPAs are revocable at the will of the lessee; 3) the fact that the lessee has joint use of the property at all times; and 4) the lessees' right to recall the land for their exclusive use at any time and for any reason.[13] *See also Adolpho v. Kealoha,* Civ. No. 243 (Haw.2d Cir.1960).[14] We reject the Appellees' contentions.

**12.** The TPAs also contain a provision disclaiming any intent to enter into a sublease or any kind of agreement granting a property interest to the Third–Party–Appellees:

> shorter term than that which the lessee holds (as compared to assignment, where the lessee transfers the entire unexpired term of the leasehold to a third party). *Transaction whereby tenant grants interests in leased premises less than his own, or reserves to himself a reversionary interest in term.*
>
> *Id.* at 1425 (emphasis added).

> Lessee and Third Party agree that *this agreement is not, nor is it intended to be, a sublease or assignment or other transfer of Lessee's possessory interest in the permit area and that no interest whatsoever in the permit area land is hereby created* on behalf of Third Party and that this Agreement is specifically revocable at the will of the Lessee.
> (Emphasis added.)

**13.** The Appellees make further reference to the history of "Block Planting Agreements" between pineapple companies and homesteaders beginning shortly after enactment of the HHCA in 1920. In 1924, the Attorney General's Office (AG) opined that "[a] lessee can make a contract of cultivation and sale merely with a pineapple company, but he cannot in any manner transfer, mortgage, pledge, or otherwise hold for the benefit of such a company, nor for any other person, excepting a native Hawaiian." 1923–1924 Op. Att'y Gen. at 544 (Att'y Gen.Op. No. 1168). Two years later, the AG interpreted *Territory v. Tsunekichi,* 23 Haw. 813 (1917), to permit "cropping contracts"—provided that such agreements merely granted liens, rather than "mortgages" upon the crops, with respect to money advanced by the pineapple company for crop production—because the contracts were "apparently favorable to the lessee under the [HHCA]." 1925–26 Op. Att'y Gen. 591, 593–94 (Att'y Gen.Op. No. 1388). Nevertheless, in response to a resolution of the territorial Senate, *see* Department Communication No. 44 (Oct. 21, 1941) (on file with the AG), the AG overruled its 1926 opinion fifteen years later:

> A provision in a contract between homesteaders on Hawaiian home lands and a pineapple company giving the company a lien on growing crops and fruit together with the right to enter upon the land and to cultivate and harvest the crops in case of default is repugnant to Section 208(5) of the Hawaiian Homes Commission Act, 1920, as amended.

Att'y Gen.Op. No. 1786 (Oct. 21, 1941). In 1955, after the pineapple companies modified the offensive lien provision so that it only applied after

harvesting, the AG issued another opinion observing that "the U.S. Congress impliedly authorized 'collective contracts and programs' because of certain amendments to Secs. 209(1) and 216 of the [HHCA] adopted in 1937, *provided that any such collective contracts and programs' ... must meet the test set forth in Section 208(5) which section was re-enacted under the same amendment.'*" Att'y Gen. Op. No. 55–20 at 5–6 (Mar. 29, 1955) (quoting Att'y Gen. Op. No. 1786) (emphasis added). *See also* 1 Haw.Rev.Stat. 191, 211 (1993) (HHCA § 209(a), as amended) (referring to "any collective contract or program"); 1 Haw.Rev.Stat. 191, 222 (HHCA § 216(c), as amended) (same). The AG ultimately concluded that "Congress must have considered the then existing cooperative block planting agreements in adopting its amendments to Secs. 209 and 216 of the [HHCA.]" Att'y Gen.Op. No. 55–20 at 10. This conclusion was based, in part, on the AG's inference that the territorial legislature "had in mind the block planting agreements[.]" *Id.* at 8–9 (citing portions of Special Comm.Rep. No. 1, in 1937 House Journal at 401–547); 1937 House Journal at 510, 514 (quoting from a University of Hawai'i survey prepared in response to a concurrent resolution of the territorial legislature, in which the author discusses the "block system" and observes that "there is no alternative ..., [e]ither large plantings must be made or pineapples will go out"). *But see* 1937 House Journal at 518–19 (discussing the formation of cooperative associations among homesteaders). In any event, the AG emphasized that "each successive [AG] who has rendered an opinion on this subject has felt that the legality of the [Moloka'i] homestead pineapple contracts should be conclusively determined in a court of law or by ... appropriate amendments to the [HHCA]." Att'y Gen.Op. No. 55–20 at 10.

**14.** Although the record in the instant case contains a copy of the second circuit court's *Adolpho* decision, which the State Appellees introduced as an exhibit, the Answering Brief of the State Appellees recognizes that we are not bound by that decision. In *Adolpho,* the second circuit court determined that "Block Planting Agreements" between a pineapple company and multiple Hawaiian homestead lessees did not violate HHCA § 208(5) because these agreements only gave the company a "right to go upon the land ... as the agent of the planters ... and [did not give the company any] rights in the crop until it is harvested, that is, after severance." *See* slip op. at 9–18 (distinguishing *In re Henderson,* 21 Haw. 104, 116–17 (1912)).

Although we discussed some of the relevant agreements in *Bush I*, we did not effect a definitive interpretation of these TPAs:

> The TPAs can only be characterized as "subleases," as referred to in § 208(5) of the HHCA, "transfers of homestead leases," as defined in HAR § 10–3–36, or "[c]ontracts covering lease lands," pursuant to HAR § 10–3–35. Regardless of which characterization the Commission utilized, the [homestead lessees' interest in entering into their] TPAs cannot be considered "property" interests because a sublease, transfer, or contract covering leased lands does not constitute a property interest pursuant to the relevant sections of the HHCA and the HAR. Thus, the right to sublease, transfer homestead leases, or enter into a contract covering the leases is not "substantial enough to require agency hearings prior to [the Commission's decision]." ... Accordingly, because the subject matter of the underlying hearing did not involve the homestead lessees' "property" interests, the hearing that transpired was not "required by law" and therefore was not a contested case as defined by HRS § 91–1(5) (1985).

*Bush I*, 76 Hawai'i at 136, 870 P.2d at 1280 (footnotes and citation omitted).[15] In other words, we only determined that due process does not require a hearing on a request for approval of a TPA because such proceedings do not involve the potential deprivation of any "property interest" held by the lessee under the HHCA and HAR.

■ Under HHCA § 208(5), a Hawaiian homestead lessee does not possess the right to "transfer to, or otherwise hold for the benefit of, any another person ..., except a native Hawaiian or Hawaiians, and then only upon the approval of the department, ... [or to] sublet the [lessee's] interest in the tract or improvements thereon." Pursuant to HAR § 10–3–35, Hawaiian homestead lessees are prohibited from "enter[ing] into any contract, joint venture, agreement or other arrangement of any sort with a third person on lands covered by the lessee's lease for the cultivation of crops or the raising of livestock" without the approval of the HHC. Finally, HAR § 10–3–36 gives Hawaiian homestead lessees who have held such lease for at least seven years a limited right to transfer their leases to other qualified individuals; the HHC also has discretion to allow such transfers if an emergency arises before the lessee has held his or her lease for seven years. Accordingly, it is clear that, compared with ordinary leaseholders, Hawaiian homestead lessees do not possess all of the "sticks in the bundle of rights commonly characterized as property[.]" *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979).

■ Our determination in *Bush I* that Hawaiian homestead lessees do not have a property interest substantial enough for due process to require hearings on requests for HHC approval of proposed TPAs, however, is not the equivalent of a finding that TPAs approved by the HHC do not convey property interests. *See, e.g., Miller v. Department of Transp.*, 3 Haw.App. 91, 93, 641 P.2d 991, 992 (1982) (citing *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230; *rehearing denied*, 368 U.S. 869, 82 S.Ct. 22, 7 L.Ed.2d 70 (1961)).[16] Nevertheless, the question re-

---

15. HAR § 10–3–35 is quoted *supra* at note 1. HAR § 10–3–36 provides:

> *Transfer of homestead leases.* Requests for transfers will be considered for approval only if the lessee has held such lease for a period of at least seven years, unless the department, in its considered opinion, finds that an emergency exists which makes transfer imperative. A lessee may transfer the leasehold to any individual who qualifies under the Act, and is at least twenty-one years old. The transferee must immediately occupy the residence lot or use or cultivate the agricultural or pastoral lot. Failure to occupy or use such lot within sixty days from date of transfer shall constitute grounds for cancellation of such lease. A transferee may own an interest in non-Hawaiian home lands real property, regardless of degree of ownership.

16. "Where it has been possible to characterize that private interest (perhaps in oversimplification) as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required." 367 U.S. at 895, 81 S.Ct. at 1748 (citing, inter alia, *Knauff v. Shaughnessy*, 338 U.S. 537 (1950), and *Jay v. Boyd*, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956)). *McElroy*

mains whether the TPAs in the instant case violate the HHCA.

Although there is no authoritative case law in this jurisdiction interpreting HHCA § 208(5), we can derive some guidance from the Supreme Court of the Territory of Hawai'i. In *Territory v. Tsunekichi*, 23 Haw. 813 (1917), the court decided a reserved question from the circuit court involving a lessee who had been charged with, inter alia, unlawfully removing sugar cane from his homestead.[17] The lessee allowed a milling company to enter his homestead and, for a fee, remove sugar cane growing thereon that was subject to a purported mortgage instrument between the lessee and a sugar company. The lessee had agreed: 1) to sell to the sugar company such cane as "may mature upon said lands during the term of two years" at a specified price; 2) that the sugar company would have the right to deduct any

advances made to the lessee; and 3) in case of default by the lessee, that the sugar company would have the right to enter upon the land and cultivate and harvest the crops as "security" for any such advances. The *Tsunekichi* court considered the agreement to be "an executory contract" under which the sugar company could, in case of breach by the lessee, pursue three alternative remedies: 1) cancellation of the agreement; 2) entrance upon the land to take possession of any crops growing thereon, and harvest the same as provided in the contract; or 3) maintenance of an action at law seeking damages for breach of contract. *Id.* at 820–21. The court observed that this agreement did not reflect an intent to transfer title and, therefore, held that it did not constitute an illegal mortgage of the lessee's interest. *Id.* at 821. *Cf. In re Henderson*, 21 Haw. 104, 114–17 (1912).[18] Accordingly, the court advised the circuit

involved the United States Navy's traditionally unfettered control when acting as a proprietor managing the internal operation of an important military establishment—*viz.*, retracting the security clearance of a cook who worked at a private concessionaire in the Naval Gun Factory. *Knauff* involved the discretionary power of the Attorney General and the Secretary of State to deny admission of aliens into the United States. *Boyd* involved the Attorney General's discretionary power to suspend deportation based on confidential information not disclosed to the alien.

In each of the above cases, the Supreme Court held that due process did not require notice and hearing prior to deprivation of the particular privilege at stake. HHCA § 208(5) grants the HHC *limited* discretionary power regarding arrangements between homestead lessees and ·other native Hawaiians that constitute a "transfer to," or a holding of the lessees' interests "for the benefit of," another person or group of persons. This statutory authority is not as broad as the "Executive's plenary power" discussed in *McElroy, supra,* but a similar due process analysis applies where an agency's discretionary power is involved. *See Knauff, supra; Boyd, supra.* Thus, it appears that constitutional due process does not require the HHC to provide notice and hearing on applications for approval of TPAs between homestead lessees and other native Hawaiians. However, for the reasons discussed *infra*, it can hardly be said that the rights conveyed by the lessee under TPAs that have been approved by the HHC, *see, e.g.,* HHCA § 208(5) (excepting approved transfers to, or holding for the benefit of, native Hawaiians from the general prohibition against "attachment, levy, or sale upon

court process" of the lessees' interest), do not amount to "interests in land."

17. The lessee held the land under a 999 year homesteading program established by the Republic of Hawai'i that is distinct from the HHCA but contains comparable provisions. *Compare* HHCA § 208(5) *with* Rev.Laws Haw. § 326(4), at 202 (1905) (providing that the lessee "shall not assign or sublet, conditionally or otherwise, his interest or any part thereof, under the freehold agreement, without the written consent of the commissioner of public lands indorsed on such agreement"). In *Tsunekichi*, the lessee was charged with fraudulent removal or concealment of mortgaged personalty:

> Whoever with a fraudulent intent to place personal property which is subject to a mortgage, beyond the control of the mortgagee, removes or conceals or aids or abets in the removing or concealing the same, and a mortgagor of such property who assents to such removal or concealment, shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year.

Rev.Laws Haw. § 3998, at 1421 (1915).

18. In *Henderson*, the territorial Supreme Court reversed a circuit court's order directing issuance of a land patent to the lessee because, inter alia, he had *illegally assigned a portion of his interest in the land* to a sugar company by entering into an agreement allowing the latter to "enter into possession of the land and to grow, cultivate and harvest thereon crops of cane for the term of four years, or indefinitely ... [for a fee]." *Id.* at 116–17.

court that it should grant the lessee's motion for a directed verdict of acquittal on the charge of fraudulent removal of mortgaged personalty. *Tsunekichi*, 23 Haw. at 821.

Although the leasing program at issue in *Tsunekichi* and *Henderson* is distinguishable from the HHCA, *see supra* note 17, these cases demonstrate that the nature of an agreement between homestead lessees and third parties must be examined closely to determine whether it complies with statutory restrictions.

> If the right to occupy any distinct and separate part of the premises is given a third person, this may constitute a subletting of such part, notwithstanding that the paper signed by the parties names it a "license," since *the court will look beyond the form of the transaction to determine its true import.*

49 Am.Jur.2d *Landlord and Tenant* § 1161 at 903 (1995) (emphasis added). *See also Kapiolani Park Preservation Soc'y v. City and County of Honolulu*, 69 Haw. 569, 578–79, 751 P.2d 1022, 1029 (1988) (noting, in the analysis of whether an agreement is a sublease or a license, that this court is not limited by the "name given [the agreement] by [the parties]").

Additional authority exists for construing a "mere license" as an "interest in land":

> It is almost too obvious to deserve statement that parties who manifestly desire to do so can effectively create a privilege in A to enter upon and to use land possessed by

B, so long as B fails to cancel the privilege. In any such case, it is immaterial whether the initial consent by B is explicit or inferred, whether the consent was oral, written, sealed, recorded, attested or lacking in some of these formalities. The intended privilege is revocable at the will of the servient owner in every such case, as the parties intended that it should be. What has been created is similar in many ways to an easement. It differs in one crucial particular, namely, that its duration is at the will of the servient owner. A revocable relationship of this sort is of great importance in the privilege implied in favor of social and business callers to enter on the land of the callee, *i.e.*, to do an act which, but for the license, would be a trespass. *The common practice of calling this relationship a "mere license" is unfortunate.* It is the most unmistakable core type of license. No adjective is needed. The use of one is an invitation to confusion. It has been called by Conrad the "grandfather" of all licenses.

*Such a revocable privilege is an "interest in land"* as that term has been defined in Section 5 of the Restatement of Property [19]; and as the term is used in this Treatise. This does not mean that the revocable privilege should be treated as a substantial interest in land, or (2) that it is such an interest in land as comes within statutory requirements of a writing or of a seal for its creation or (3) that the licensee

---

**19.** As cited by Professor Powell, the Restatement of Property also defines a license as an "interest in land," and provides:

§ 512. DEFINITION OF "LICENSE."
   The term "license," as used in this Chapter, denotes an interest in land in the possession of another which
   (a) entitles the owner of the interest to a use of the land, and
   (b) arises from the consent of the one whose interest in the land is affected thereby, and
   (c) is not incident to an estate in the land, and
   (d) is not an easement.
Comment:
   . . . .

   c.  *Interest in land.* A license, as the legal consequence of a consent given to one person to use the land of another, includes always a privilege and, perhaps, other legal relations with respect to the land in question. A privilege to use certain land constitutes an interest in that land. (See § 5, particularly Comment c.) All "licenses," as the term is used in this Chapter, are "interests in land" as that phrase is used in the Restatement of Property. This does not mean that they are "interests in land" in every use of that phrase. For example, it does not mean that they are necessarily "interests in land" as that phrase is used in the Statute of Frauds.
*Restatement of the Law of Property*, § 512 at 3115–16 (1944).

is entitled to compensation on a taking of the servient parcel by condemnation. *The evanescent, fleeting, revocable character of the interest justifies a denial of treatments accorded to more substantial interests in land but does not justify a denial of its character as an interest in land, while it lasts. So long as it continues, a license derogates from the completeness of the servient owner's ownership and this requires it[s] recognition as an "interest in land."*

2 R. Powell and P. Rohan, *Powell on Real Property* § 34.25 at 34–298 through 34–301 (1995) (emphasis added and footnotes omitted). *See also McCandless v. John Ii Estate, Ltd.,* 11 Haw. 777, 788–89 (1899) ("If the instrument in question passes to the plaintiff a right to use the land for a definite term for a specific purpose, . . . it creates an 'interest' in the land, and therefore it does not create a license revocable at the will of the licensor[.]").

With the above precepts in mind, we observe that the TPAs in the instant case address specific parcels of property and are arguably for fixed terms because they require fixed notification periods for revocation.[20] Although they purport to be terminable at will and preserve concurrent use by the lessees and the third parties, the TPAs transfer at least a portion of the lessees' extant interests in their homesteads. As compared, for example, with a legitimate employment contract, these particular TPAs

provide a right of entry (allowing non-Hawaiian third parties to cultivate crops and raise livestock on homestead lands) that is repugnant to HHCA § 208(5).[21]

Thus, we hold that the TPAs in the instant case are void *ab initio* because they violate the HHCA.

## IV. CONCLUSION

For the foregoing reasons, we reverse the circuit court's order granting summary judgment and awarding costs to the Appellees and remand with instructions to enter an order granting summary judgment and awarding costs, exclusive of CALR expenses, if any, to the Appellants.

---

**20.** Each of the twenty-three TPAs at issue in this case contains a revocation clause either identical or substantially similar to the following:

> Term of use. Notwithstanding any other provisions herein, this Agreement shall be revocable at the will of the lessee upon _____ days' notice. Lessee may recall its land or cancel this agreement at any time and for any reason.

In eleven of the TPAs, the parties entered the number "365" (three hundred and sixty-five) in the blank space, indicating that 365 days' prior notice was required before the lessee could revoke the TPA. The parties entered "180" (one hundred eighty) days in three additional TPAs and "120" (one hundred twenty) in four other TPAs. In two further TPAs, the parties entered

"90" (ninety) and "30" (thirty) days, respectively. In the three remaining TPAs, the parties left the blank space empty.

**21.** To the extent that the rationale provided by the circuit court in *Adolpho, supra,* is inconsistent with today's decision, it is hereby disapproved. Notwithstanding the express contemplation of "collective contract[s] or program[s]" in HHCA §§ 209(a) and 216(c), we reject the Appellees' argument, *see supra* note 13 (citing Att'y Gen.Op. No. 55–20 at 8–9 & 10), that these provisions created an exception to the plain and unambiguous language of HHCA § 208(5). However, we expressly reserve comment on whether the State Appellees breached their fiduciary duty as trustees of the Hawaiian Homelands trust.